**APOLLO COMPUTER, INC. and Subsidiaries, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 91–1306T.**

United States Court of Federal Claims.

Dec. 7, 1994.

Robert T. Carney, Washington, DC, attorney of record for plaintiff. Rogers & Wells, of counsel.

Stuart J. Bassin, Washington, DC, with whom was Assistant Attorney General Loretta C. Argrett, for defendant. Mildred L. Seidman, David Gustafson and William K. Drew, Dept. of Justice, of counsel.

## OPINION

HARKINS, Senior Judge.

■ Apollo Computer, Inc. (Apollo or plaintiff), a domestic corporation founded in 1980, seeks income tax refunds based upon the disallowance of depreciation deductions and investment tax credits applicable to calendar taxable years 1983, 1984 and 1985. In the years in issue, Apollo designed, manufactured, marketed, and serviced computer equipment. The core of plaintiff's manufacturing business involved the design and manufacture of computer workstations and the software necessary to operate the computers. Plaintiff also provided related products and maintenance and repair services to its customers. In 1983, the first year in issue, plaintiff had approximately 1,300 to 1,400 employees and had total net sales of $80.7 million. As of December 31, 1985 (the end of the period in issue), plaintiff employed 3,300 employees and had total net sales of $295.6 million.

After audit, the Internal Revenue Service (IRS) issued a 90-day notice of deficiency on September 16, 1988, and on January 31, 1989, assessed taxes and interest in the following amounts:

| Taxable Year Ending | Tax | Interest | Total |
| --- | --- | --- | --- |
| 1983 | $ 4,939.00 | $ 1,351.66 | $ 6,291.66 |
| 1984 | $3,700,263.00 | $1,581,632.47 | $5,281,895.47 |
| 1985 | $ 67,217.00 | $ 18,409.08 | $ 85,626.08 |

On March 21, 1989, the assessed taxes and interest were paid in full. Claims for refund were filed on March 21, 1989, and were disallowed by the IRS on July 24, 1989.

In its complaint, filed July 23, 1991, plaintiff based its refund claims on two issues: (1) the Rotable Spare Parts issue, and (2) the DISC (Domestic International Sales Corporation) issue. In the alternative, plaintiff sought relief under I.R.C. § 7805(b). The refund issues initially were presented on stipulated facts and cross-motions for partial summary judgment. Oral argument was heard on the Rotable Spare Parts issue on March 10, 1993, and on the DISC issue on March 12, 1993.

■ The DISC issue was concerned with whether the research and development ex-

pense allocation moratorium of the Economic Recovery Tax Act of 1981 (ERTA), section 223[1], is applicable to the computation of "combined taxable income" (CTI) of Apollo Computer, Inc. and Apollo International, Inc. under I.R.C. § 994(a)(2)[2]. A bench ruling on the DISC issue was made at the close of argument on the cross-motions for partial summary judgment. The reasons for the decision were stated on the record.

The key to the disposition of the cross-motions on the DISC issue was the nature of the computation of CTI. The determination of CTI differs from that of foreign source taxable income. CTI determines the relative amount of income earned by a DISC and its related supplier from the export of U.S. manufactured goods and, thereby, the tax benefit derived from the export transaction. A taxpayer may derive gross receipts qualifying for DISC treatment, calculate CTI, and claim the related tax benefits with respect to export transactions irrespective of whether they generate foreign source or domestic source income. Therefore, the sourcing of income is not relevant for purposes of calculating CTI.

The bench ruling agreed with the holding in *St. Jude Medical, Inc. v. Commissioner*, 97 T.C. 457, 1991 WL 221136 (1991). The research and development expense allocation and apportionment moratorium established by section 223 of ERTA was found to be inapplicable to the computation of combined taxable income. Defendant's motion for partial summary judgment on the DISC issue was allowed and plaintiff's motion on that issue was denied.

On the Rotable Spare Parts issue, each of the cross-motions for partial summary judgment were denied because genuine issues of material fact were found to be in dispute. At the close of argument, material issues of fact in dispute as to each cross-motion were identified on the record, and a schedule for further proceedings under RCFC Appendix G was established. Trial was held in the period of September 20–27, 1993. On the Rotable Spare Parts issue, plaintiff called four fact

witnesses, and two expert witnesses: Professor James E. Wheeler, and Dr. Irving J. Plotkin. Defendant called three fact witnesses and two expert witnesses: W. Eugene Seago, Ph.D., CPA, and Professor Dennis J. Gaffney. Posttrial briefing was completed on April 21, 1994.

Central to plaintiff's claim is the proper method of accounting under the I.R.C. for a pool of spare parts (Rotable Spare Parts) used by plaintiff in its computer repair business. Apollo accounted for the pool of spare parts as fixed assets, and claimed depreciation deductions and investment credits with respect to the capitalized cost of the pool. Using the fixed asset method of accounting (i.e., manufacturing cost was capitalized and annual depreciation deductions were claimed), Apollo, on the basis of a 5–year useful life, capitalized additions to the pool and took depreciation deductions for the pool vintage account for a particular year. On audit, the IRS characterized the spare parts in the pool as property held primarily for sale in the ordinary course of business that should be included in inventory, and disallowed Apollo's claims for depreciation deductions and investment tax credits for the years in issue. The IRS, under I.R.C. § 446, required Apollo to change its method of accounting. There is no dispute that, if the requirement to change to an inventory method of accounting was proper, investment tax credits would not be available.

\* \* \* \* \* \*

*Description of Business*

Apollo was engaged in the manufacture and sale of computer systems and related software. The computer systems and related equipment were manufactured at a facility (Manufacturing Facility) located in Exeter, New Hampshire. In addition to its computer manufacturing business, Apollo provided a computer maintenance/repair service for computers it sold. The maintenance and repair service was managed from a separate facility (Repair Facility) located in Chelmsford, Massachusetts.

---

**1.** Pub.L.No. 97–34, 95 Stat. 172, 249.

**2.** Internal Revenue Code of 1954, as amended through the period in issue.

In Apollo's financial reports to the Securities Exchange Commission (SEC), total net revenues from the maintenance/repair service for the tax years in issue were stated as:

| 1983 | $ 2,765,000 |
|------|-------------|
| 1984 | $10,954,000 |
| 1985 | $33,713,000 |
| TOTAL | $47,432,000 |

In order to conduct its computer maintenance/repair business, Apollo established and maintained a pool of "Rotable Spare Parts." A Rotable Spare Part was a part that could be repaired when it malfunctioned and could then be returned to the pool for continued use in Apollo's maintenance/repair business. Apollo's Rotable Spare Parts were acquired from its Manufacturing Facility. During the years in issue, the Rotable Spare Parts pool contained hundreds of different types of parts, and thousands of different parts, which were located at the Repair Facility, as well as at various regional maintenance facilities located throughout the United States. During the years in issue, virtually all maintenance of Apollo computers was provided by Apollo directly to the owners of Apollo computers.

The parts in the Rotable Spare Parts pool at all times physically were segregated from regular manufacturing inventory produced and shipped from Apollo's separate Manufacturing Facility. The quantity of each type of part carried in the Rotable Spare Parts pool was statistically determined based upon anticipated rates of breakdowns. The number of parts carried in the pool actually was equal to 90 percent of anticipated needs. There were no "excess" parts in the pool, i.e., there were no parts beyond those required to service contracts in Apollo's maintenance/repair business. The pool was maintained through orders with the manufacturing operation on a monthly basis, using a mathematical algorithm which took into account the failure characteristics of the computers and the installed base of computers.

At the end of the manufacturing cycle of a line of computers, the maintenance/repair business would order sufficient spare parts from the manufacturing operation to ensure that it could perform the required services under existing contracts for the remainder of the product line's expected life. The number of parts ordered was based upon forecasts of the number of computers which would remain in service and the failure characteristics of the computer. The objective was to obtain a pool of Rotable Spare Parts to ensure an ability to maintain its own computers and computers sold to customers for up to 7 years.

Apollo reported to the SEC that its manufacturing operation was not vertically integrated; i.e., it did not manufacture most of the parts for its computers. Standard parts and components were used to more quickly integrate advances in technology and take advantage of research and development efforts of component manufacturers.

Repairs to computers generally were made through a process of identifying and replacing any malfunctioning parts. Over the course of a year, Apollo typically would replace several thousand parts from the Rotable Spare Parts pool. During 1984 and 1985, each of Apollo's computers averaged two failures per year.

Apollo used both Rotable Spare Parts and expendable parts to repair customers' computers. Parts costing less than $250 generally were treated as expendable. Expendable parts included basic nuts and bolts, along with parts like a terminator disk drive controller which had a cost of $399. Apollo did not, from an operational standpoint, make any effort to separate the parts by the year they were placed in service. The larger more complex parts in the Rotable Spare Parts, such as printed circuit boards, carried individual serial numbers.

To repair a malfunctioning computer, after notice of a problem, typically Apollo would dispatch a service technician to the customer's location with a supply of Rotable Spare Parts. The technician would take the types of parts believed to be necessary to diagnose and correct the problem described by the customer.

Upon arrival at the customer's premises, the service technician would inspect the computer and run various diagnostic software

programs to determine which parts were not functioning properly. Apollo's diagnostic testing included the use of Rotable Spare Parts as testing tools. That is, a Rotable Spare Part would be exchanged with the identical part in the malfunctioning computer, and further diagnostics would be run. If the problem was not corrected, the Rotable Spare Part would be "unswapped," and the customer's original part would be restored to the customer's computer. This process would continue until the computer was functioning properly.

A part that had been identified as a probable cause of a malfunction was replaced with the identical functioning part from the Rotable Spare Parts pool, and the apparently malfunctioning part was retained by the service technician. By "swapping" parts and repairing malfunctioning parts later, the amount of computer "downtime" could be kept to a minimum. The parts removed from the customers' computers were returned to the Repair Facility. At the Repair Facility, these exchanged parts were inspected and diagnostic testing was performed. On average, approximately 25 to 30 percent of the parts that appeared to be malfunctioning and were removed from the customer's computer, after further testing at the Repair Facility were determined to be operational (i.e., not malfunctioning).

Malfunctioning parts removed from a service customer's computer were repaired, if possible, by qualified technicians, and were then returned, along with parts determined not to be malfunctioning, to the Rotable Spare Parts pool. The only parts that were not repaired were parts exchanged at the end of the life cycle of the associated product, and parts that were scrapped after having been returned to the Repair Facility three (3) times. Malfunctioning parts that could not be repaired or were obsolete, as well as those at the end of their life cycle, were scrapped.

Apollo's service personnel completed standardized reports at the close of each service call. Those reports showed the problem encountered, the corrective action taken, and any parts installed.

Four types of services were available to Apollo's customers, by contract, which could involve the use of Rotable Spare Parts: (1) Warranty Support; (2) System Maintenance Agreement; (3) Shared Maintenance Agreement; and (4) Time and Materials Service.

*Warranty Support*

Apollo computers typically were sold with a 90–day warranty that covered all parts and labor. When a customer's computer that was still under warranty malfunctioned a service technician would inspect and repair the computer. Apollo provided telephone support via an established hotline and on-site support when a hardware problem existed. In some instances, the swapping of parts took place. Warranty repair service was the equivalent of a 90–day maintenance contract with the cost thereof included in the purchase price.

*System Maintenance Agreement*

Most of Apollo's computer maintenance business was conducted through a standardized "Apollo System Maintenance Agreement" (the Agreement). The Agreement obligated Apollo to provide all parts and labor, product upgrades, preventive maintenance, and telephone assistance necessary to keep the customer's computer operational for the duration of the contract (usually one year) in exchange for the payment of a predetermined fee. Most customers paid on a monthly basis; an option to pay annually was available. The fixed fee was based on factors that took account of market competition, labor costs for field and technical support engineers, general overheads, depreciation for the entire Rotable Spare Parts pool factored in on a per unit basis, and a profit margin.

Purchase of the Agreement was an option available to a customer; a customer could purchase a computer without entering the Agreement. The amount of fee did not vary with the number of service calls made, or the number of parts used during the covered period. The Agreement stated: "Replacement parts shall be furnished on an exchange basis and all replaced parts shall become the property of Apollo." Approximately 95 percent of all of Apollo's service revenue during the years in issue was derived from the System Maintenance Agreement.

The Agreement provided the same services that were offered under the Warranty Support program, except that it was on an annual contractual basis. Approximately 95 percent of all Rotable Spare Parts usage was attributable to System Maintenance Agreements and to Warranty Support.

*Shared Maintenance Agreement*

Apollo sold computers directly to computer end users. Apollo also sold computers to "original equipment manufacturers" (OEMs). An OEM was a customer that resold computers to third parties (end users) after adding significant value to the computers in the form of hardware enhancement or applications software.

Apollo's end users included large corporations, such as AT & T, Boeing and Caterpillar, as well as various colleges, universities and financial institutions. It was not uncommon for Apollo's customers to own a couple hundred Apollo computers. During the years in issue, approximately half of Apollo's revenue from sales of new computers was derived from sales to end users, and half was derived from sales to OEMs.

During the years in issue there were three OEMs: Auto-trol Technology Corp. (Auto-trol), Mentor Graphics Corp. (Mentor), and Calma Company (Calma). Auto-trol had a Shared Maintenance Agreement with Apollo. Mentor and Calma, on the other hand, during the years in issue, represented Apollo to their customers (end users) who would purchase a Systems Maintenance Agreement directly from Apollo. Mentor or Calma would take the first call from their customer with a problem. If it was a hardware problem, the OEM would call Apollo, which then provided maintenance on site.

Auto-trol and Mentor were Apollo's first customers to develop Shared Maintenance Agreements. In 1986, Mentor and Caterpillar, as end users, became parties to Shared Maintenance Agreements.

Under a Shared Maintenance Agreement, the Apollo customer would use its own personnel to conduct a computer repair business. Equipment would be purchased from Apollo's inventory of newly manufactured parts in order to establish its own pool of spare parts. Under the Shared Maintenance Agreement, the customer relies on its own field engineers to make repairs.

During the years in issue, Auto-trol was the only OEM that performed its own repairs of malfunctioning computers. Auto-trol itself repaired malfunctioning parts removed from its customers (end users) using schematics and other technical assistance provided by Apollo pursuant to a Shared Maintenance Agreement. Auto-trol acquired spare parts for its own rotable spare parts pool from Apollo's manufacturing operation. Parts acquired by Auto-trol for use as spare parts were often purchased in the form of a complete computer system that Auto-trol would cannibalize for spare parts.

Under a Shared Maintenance Agreement (of which only Auto-Trol had during the years in issue), a customer could, on some occasions, forward parts to Apollo they could not repair themselves, Apollo could repair and return the same part or return a different part from the Rotable Spare Parts pool. This was known as the "repair-exchange" or "return to factory" (RTF) option under the Shared Maintenance Agreement.

The RTF provision: (a) authorized the OEM "Upon authorization by Apollo," to return listed, defective, repairable parts to Apollo for repair, which part "or a part of equivalent functionality" will be returned, subject to a 10 percent (10%) discount from "Apollo's then current published list repair charges," and (b) stated Apollo will provide a parts exchange service for certain parts "designated by Apollo," under which "a listed, defective, repairable part" could be returned to Apollo, "in exchange for replacement part at Apollo's then current exchange price."

RTF repair service in the years in issue was available to Auto-trol when it was unable to complete the repair of a part. In such a case, the exchange fee for the repairs was derived from Apollo's Spare Parts Price List. The RTF repair charge varied with the return time requested—30-day return, 7-day return, or 24-hour return. When Auto-trol initiated a repair-exchange transaction, it sent a purchase order to Apollo setting forth the quantity, part description, part number, list price and discounted price along with the

part. Apollo's billing was based upon the Spare Parts Price List to establish the exchange fee for each repair-exchange transaction, which could be as high as $7,350 for a disk drive assembly.

Only rarely did Auto-trol receive back the same part it had returned to Apollo. If the same part was not returned, its replacement came from the Rotable Spare Parts pool. In an emergency situation, a part from the pool would be shipped within 24 hours and the failed part was not received until later. If the failed part for some reason was not received, or when the failed part was not repairable, the exchange fee would not be affected.

RTF service under a Shared Maintenance Agreement, on the rare occasions where such service occurred, was the equivalent of exchanges from the Rotable Spare Parts pool under a Systems Maintenance Agreement. During 1984 and 1985, Auto-trol's use of the RTF service averaged one or two transactions per month. The revenue derived during the years in issue from the RTF option with the one OEM (Auto–Trol) under a Shared Maintenance Agreement involved less than one percent of total service revenue. In 1985, this percentage amounted to approximately $337,000.

### Time and Materials (T & M)

After expiration of the 90–day warranty period, a customer could have computer malfunctions repaired on a Time and Materials (T & M) basis instead of through a System Maintenance Agreement or a Shared Maintenance Agreement. Under T & M, the customer would call Apollo for service, and thereafter Apollo's technical engineer would conduct the same repair sequence, including the use of Rotable Spare Parts for diagnostic testing. Except for calculation of the charge for T & M service, the services provided by Apollo were identical to those provided through a System Maintenance Agreement. There was an exchange of parts with T & M customers, with the broken part being repaired and returned to the Rotable Spare Parts pool.

Under T & M, the customer was billed for the service technician's time, and, in addition, an "exchange fee" was charged based upon the type of part exchanged from the Rotable Spare Parts pool. This exchange fee was determined by Apollo's estimate (from experience) of the total costs of providing the repair service, including depreciation costs of carrying the Rotable Spare Parts pool and anticipated repair costs for malfunctioning parts, combined with a substantial mark-up to encourage computer owners to obtain System Maintenance Agreements.

The total revenues derived from the exchange of parts in connection with T & M repairs involved no more than 2½ percent, of Apollo's total revenue from the computer maintenance business during the years in issue. The exchange fee charged for T & M repairs generated approximately $843,000 in 1985.

### Accounting Method

In its federal income tax returns for the years in issue, Apollo accounted for its pool of Rotable Spare Parts by using a fixed asset method of accounting. That is, the acquisition cost incurred with respect to Rotable Spare Parts was capitalized, and annual depreciation deductions were claimed. Parts, produced in the New Hampshire manufacturing facility, were transferred to the service facility at manufacturing standard cost, and were capitalized as fixed assets, with a 5–year useful life. Transfer of parts from Apollo's manufacturing operation to the repair business were reflected on Apollo's books and records as intracompany-transfers of assets at the standard manufacturing cost of the parts.

Throughout the years in issue, the fixed asset method of accounting for Rotable Spare Parts was consistently followed by Apollo, for both financial accounting and tax purposes. After 1985, for financial accounting purposes, the useful life period of parts in the Rotable Spare Parts pool was changed from 5 years to 3 years. Depreciation schedules applied for financial accounting purposes differ from depreciation schedules for tax purposes. Annual depreciation allowance for financial accounting purposes was on a straightline basis; ACRS (Accelerated Cost Recovery System) was applied for tax accounting purposes.

The useful lives of the parts in the Rotable Spare Parts pool were limited to the number of years that the computers associated with the parts were kept in service. As a result, the remaining revenue earning potential of the Rotable Spare Parts declined from year to year.

The capitalized cost of each of the Rotable Spare Parts was not separately depreciated. Instead, the total costs of all parts acquired in a given year were combined in a vintage account, and annual depreciation deductions were computed with respect to each such vintage account. For purposes of computing depreciation, Apollo treated identical parts added to the Rotable Spare Parts in different years as elements of different vintage layers. Apollo produced a particular type of part that was included in Rotable Spare Parts in more than 1 year, and thus accounted for the cost of such parts in two or more vintage layers.

Apollo's records indicate that it did not scrap any of the Rotable Spare Parts during 1983 or 1984. The annual additions and scrapping claimed with respect to vintage accounts for Rotable Spare Parts for each of the years in issue are as follows:

| Year | Additions (Capitalized Cost) | Dispositions (Scrapping) |
|------|------------------------------|--------------------------|
| 1983 | $1,681,00 | –0– |
| 1984 | 7,793,000 | –0– |
| 1985 | 12,479,000 | 1,068,000 |

Depreciation deductions were claimed with respect to each of the vintage accounts above for each of the years in issue in total amounts for each taxable year as follows:

| Taxable Year | Depreciation Claimed |
|--------------|----------------------|
| 1983 | $ 354,101 |
| 1984 | 1,636,116 |
| 1985 | 3,851,019 |

The basis for depreciation of the Rotable Spare Parts claimed by Apollo increased from less than $500,000 to more than $21 million during the years 1983 through 1985.

\* \* \* \* \* \*

### DISCUSSION

The principal legal issue in this case is whether Apollo in 1983, 1984, and 1985 prop- erly accounted for the parts used in the maintenance and repair segment of its busi- ness. To obtain a refund, Apollo must show its fixed asset method of accounting for Rota- ble Spare Parts complied with the I.R.C. and income tax regulations that applied to the manufacture, marketing and service of its computers in the relevant years. If so, the IRS would be precluded from requiring Apol- lo to change its method of accounting for those years. Defendant contends Rotable Spare Parts properly should be accounted for as inventory. Under the I.R.C. and income tax regulations, Rotable Spare Parts treated as inventory would not be entitled to depreci- ation, and investment tax credits would not be available.

Compliance with the I.R.C. and income tax accounting regulations in the years in dispute is determined by analysis of the particular facts and circumstances that define Apollo's business of manufacturing and marketing computers in the tax years. Perspective on analytical problems that arise from applica- tion of the I.R.C. and income tax regulations is provided by examination of the technologi- cal state of the computer business prior to and in the 1983–85 period, and the regulatory climate in the IRS in the years in dispute.

This perspective includes, and is complicat- ed by, the lapse of time required for judicial resolution of income tax problems in this industry. Business conditions in 1980 and 1981 applicable to the Rotable Spare Parts issue were examined in an August 11, 1992, decision of the Tax Court in *Honeywell v. Commissioner*, 64 T.C.M. (CCH) 437, 1992 WL 189849 (1992). The 8th Circuit's final appellate action was on June 22, 1994. Ex- amination of Apollo's business practices in 1983, 1984, and 1985, commenced with an audit in 1986, a notice of deficiency on Sep- tember 16, 1988, assessment of taxes and interest on January 31, 1989, and disallow- ance of claims for refund on July 24, 1989. In this court, the claims have proceeded through motions for summary judgment, or- ders on March 10, and March 12, 1993, and trial in September 1993. Testimony at the trial in 1993, based on recall from memory about events and transactions that occurred in 1984 and 1985 in a former job, is usually

neither as specific or as accurate about particular facts in those events and transactions as the information that is contained in contemporary documents.

A characteristic of the computer business has been its phenomenal rate of change. Manufacture and marketing of computers is new, relatively young, and rapid technological change and early obsolescence is typical. Manufacturing techniques and marketing services are in continuous flux. A truism of commentators on the pace of technological change in computers notes: "If you can built it, it is obsolete."

During the period in issue, Apollo's revenues from its maintenance/repair business increased substantially. In 1983, Apollo earned a total of $2.7 million from its computer maintenance/repair business. In 1985, the total was $33 million.

During the years in issue, plaintiff was introducing a new line of computers every 18 to 24 months. Each new line had substantially greater capabilities than its predecessor. Most of the parts in an Apollo computer changed between succeeding product lines so that a circuit board from one product line would not work in the succeeding product line. Monitors and keyboards, however, often would not change and could be used in succeeding lines of computers. A part's usefulness and reliability changed over time. New parts tended to have more failures than slightly older parts.

Computer manufacturing and marketing during the 1970's and through the years in issue saw the emergence of new participants and restructuring through mergers and acquisitions. In its 1983 financial report, Apollo listed Hewlett Packard as a major competitor. In May 1989, Apollo became a subsidiary of Hewlett Packard. Personnel movement was frequent and employment was expanding. At the time of trial, plaintiff's fact witnesses on Apollo's maintenance/repair service business no longer were employed by Apollo. Further, none of plaintiff's fact wit-

nesses participated directly in Apollo's maintenance/repair business in 1983.

During the 1983–85 period, Apollo faced serious competition from companies such as IBM, Sun Microsystems, and Digital Equipment Corporation, which were in position to satisfy the needs of Apollo's customers for new equipment. The areas of competition included price-to-performance ratios, product capability, and the availability of service and support. Cost of maintenance was an important consideration in an initial computer purchase, and market forces limited the amount which Apollo could charge. in its maintenance/repair business. In the years in issue, Apollo was the only company that provided repair services and repair parts for computers it manufactured. In subsequent years, other companies began to offer repair services and repair parts for Apollo computers.

During the late 1970's, personnel at the district level in the IRS initiated six studies and audits, the objective of which was to establish a uniform position on industry issues where facts and circumstances warranted uniform application of statutory law. One of the studies and audits included the methods of accounting for spare parts used by various manufacturers in their computer maintenance/repair service businesses. At that time, there were 12 leading companies that provided computer maintenance/repair service for leased or customer-owned equipment; seven used a fixed asset method of accounting in which rotable parts were capitalized and depreciated; five used an inventory method of accounting in which rotable parts were treated as nondepreciable inventory items. The methods used in either group varied from company to company. This IRS study effort extended from 1976 to 1985, and involved IRS personnel at the district audit level, the Examination Division's regional office, specialists in its Industry Specialization Program (ISP), the National Industry Coordinator in Washington, D.C., and the Director, Corporate Tax Division (Technical).[3]

---

3. The Tax Court, in the *Honeywell* case, discussed these studies in "Accounting and Tax Treatment of Rotable Parts in Computer Industry." 64 T.C.M. at 441–42. Apollo relies heavily

on the *Honeywell* analysis, and much of the same information and analysis presented to the Tax Court in that case is contained in plaintiff's exhibits in this case. Apollo's expert witnesses on

One of the six studies selected for analysis at the district level was whether rotable parts to be used in the repair and maintenance of computers should be treated as capital assets and depreciated on the same basis as the equipment to which they relate. In April 1978, a consensus was reached in the studies, and six "Issue Papers" were prepared and incorporated into a final report captioned: "Business Machine Industry-wide Audit" (the so-called Brown Report).

On the maintenance/repair parts issue, the Brown Report recommended that the taxpayer be required to classify spare parts as either rotable or nonrotable. Such classification was to be subject to review and challenge during the corporate audit. The recommendation included:

> If rotable, they should be capitalized and depreciated in the same manner as is spelled out in Revenue Rulings 69–200 and 69–201. The depreciable life used should be based on facts and circumstances as to the useful life of the machinery and equipment to which they relate beginning at the time the machinery and equipment were placed in service. This procedure will be followed whether the machinery and equipment is leased or sold.[4]

In 1979, the ISP was created in the IRS Examination Division. The purpose of the ISP was to provide for the identification and development of issues and to insure uniform and consistent treatment by IRS auditing personnel of issues within an industry. The computer industry was among the industries designated. The six issues selected for analysis in the ISP for the computer industry were those that had been analyzed in the Brown Report.

From 1980 through 1985, the ISP circulated issue papers throughout the industry. The ISP Issue Papers that discussed the proper accounting treatment of rotable parts concluded that the parts should be capitalized and depreciated over the life of the computer with which the rotable parts were associated.

On March 25, 1985, the IRS issued a private letter ruling that an inventory method of accounting was required for spare parts used in computer repairs.[5] The record is unclear as to when the private letter ruling became known throughout the industry. In Fall, 1985, the IRS revenue agent informed Honeywell that the ISP had changed its position on the treatment of rotable parts to require that such parts be treated as inventory. In April 1986, at the start of the IRS audit of Apollo's returns for the years in issue, the IRS agents told Apollo's tax director that the IRS was reconsidering the ISP position. By a 30–day letter dated April 13, 1987, the IRS advised Apollo that it proposed to disallow depreciation deductions and investment tax credits on the spare parts pool. The official notice of the IRS to Apollo that its Rotable Spare Parts should be included in inventory was dated September 16, 1988.

At trial, plaintiff's expert testified that, for financial accounting purposes, the fixed asset method of accounting for Rotable Spare Parts was utilized in the 1983–85 period, by eight of the ten largest computer companies. For tax accounting purposes, however, because of IRS pressure to change to inventory accounting, by the end of 1985 only half of those companies used the fixed asset method of accounting for Rotable Spare Parts. He noted that while five companies, for tax purposes, accounted for Rotable Spare Parts as inventory, for financial reporting eight out of the 10 continued to use a fixed asset method of accounting for Rotable Spare Parts.

the Rotable Spare Parts issue also testified as experts in *Honeywell*. Defendant points out that the ISP Position Papers and the Brown Report were informal IRS documents that were not approved by any person with authority to bind the Government.

4. Rev.Rul. 69–200, 1969–1 C.B. 60 deals with depreciation of pools of rotable parts used in the airline industry as fixed assets with the same useful life as the related aircraft. Rev.Rul. 69–201, 1969–1 C.B. 60 deals with depreciation of standby replacement parts purchased with machinery used in pit mining as fixed assets with the same useful life as the related machinery and equipment. The IRS has never officially revoked or modified Rev.Rul. 69–200.

5. Tech.Adv.Mem. 85–28–006 (Mar. 29, 1985).

From the foregoing, it is apparent that analysis of applicable income tax statutory and regulatory criteria relevant to accounting for Rotable Spare Parts has application to Apollo's maintenance/repair business in an extremely limited window of time. Changes in technology and business practice may produce different analyses of the particular facts and circumstances that define Apollo's maintenance/repair business in one or more of the years during the period in issue, or in subsequent years. Further, analysis of Apollo's accounting practices in the years at issue may have little application to accounting methods used by other companies in the 1980–85 period. Finally, the analysis in *Honeywell* for that company's 1980–81 maintenance/repair business involved accounting records that covered customer-owned computers as well as computers leased to customers. The IRS proposed no adjustment to Honeywell's fixed asset method of accounting for rotable spare parts used to service leased computers. The decision on Honeywell's record before the Tax Court that in 1980–81 its rotable spare parts business for customer-owned computers was not inventory does not necessarily apply to Apollo's 1983–85 maintenance/repair business.

*Accounting Change*

In *Honeywell,* the Tax Court described the inventory method of accounting for rotable parts in Honeywell's replacement parts pool to service customer-owned computers as including the following factors: (a) Honeywell would be required to write off the cost of a rotable part in its replacement parts pool when the part was actually exchanged with a rotable part from the customer's computer; (b) Honeywell would be required to include in income the fair market value of the rotable part received; and (c) the fair market value of the part received was equal to the cost of the rotable part less the estimated cost to repair it. 64 T.C.M. at 442.

Plaintiff has incorporated in the record of this case extracts from stipulations, and some of the documents that were the basis for the stipulations, that had been filed in the *Honeywell* case. Such information, however, is not adequate to show (1) the content of the replacement parts pool that was depreciated,

(2) the source of parts (manufactured by Honeywell or purchased from suppliers) considered to be rotable (i.e., repairable, reusable, reservicable, and not expendable), (3) specific accounting records produced by Honeywell to support its depreciation calculations, or (4) the volumes of rotable parts used to maintain leased computers as compared to customer-owned computers. Honeywell apparently did not capitalize and depreciate the cost of expendable parts. 64 T.C.M. at 446.

The record in this case does not contain comparable information on Apollo's pool of Rotable Spare Parts or specific accounting records that were the basis for its depreciation calculations. Throughout this case, the parties have adamantly refused to produce or agree upon what an acceptable inventory method of accounting requires. Apollo's experts argue that the "IRS inventory method" applicable to Apollo's maintenance/repair business is described in the ISP Issue Paper, dated July 31, 1991, and the September 16, 1988, 90–day deficiency notice. Plotkin's report, however, emphasizes that "the method described by the IRS does not correspond with my understanding of an inventory method of accounting." Defendant charges that plaintiff attempts to establish the existence of a monolithic "IRS method" of inventory accounting that misrepresents the IRS position. In its response to plaintiff's pretrial interrogatories about a description of the inventory method of accounting, defendant stated:

> As a general proposition, the precise parameters of an inventory method of accounting depend upon the specific facts of each individual taxpayer. In this case, plaintiff has not presented a specific proposal regarding the type of inventory accounting method it would propose to adopt or the detailed factual material needed to determine the specific inventory accounting method which would be appropriate in plaintiff's case. Thus, defendant cannot reply to the specific application of an inventory accounting method to plaintiff's situation because it has insufficient information.

Defendant's response included a document dated July 31, 1991, captioned: Data Processing Industry Coordinated Issues "Rotable" Spare Parts (ISP Issue Paper). With respect to the ISP Issue Paper, defendant explained:

The ISP issue paper position suggests seven types of adjustments which should be made to place a taxpayer which had been on a fixed asset accounting method on an inventory method of accounting, described as follows:

(1) Current depreciation and investment tax credit would be disallowed.

(2) An adjustment under I.R.C. § 481 would be made with respect to prior depreciation taken on parts still in the pool. In other words, the taxpayer would be required to take into income an amount equal to depreciation taken over prior years, less an adjustment for parts retired from the pool before the current year. The number of prior years would be determined by the life of the parts as reported by the taxpayer.

(3) Investment tax credit taken in prior years could be recaptured to the extent that it can be determined that the parts for which the credit was taken were sold or exchanged during the current year.

(4) Assuming that the cost of repairing returned parts was taken as a current deduction, this expense should be capitalized and added to the inventory account.

(5) The value of parts retired from the pool during the year should be subtracted from the inventory account and deducted.

(6) An amount equal to the fair market value of parts returned from customers should be taken into income and added to the inventory account.

(7) The carrying value of parts placed in customer's machines, *i.e.,* sold, should be added to the cost of goods sold and subtracted from the inventory account.

Some modifications to this system, including adoption of various "short-cut" conventions, might be appropriate depending upon the specific facts of plaintiff's situation.

In this case, adjustments (1)–(3) were made by the examining agents during their audit of plaintiff. The documents in defendant's possession indicate that plaintiff never made a specific proposal relating to potential adjustments (4)–(7).

Plaintiff's experts recognized there were significant differences between accounting for income tax purposes and accounting for financial reporting purposes. Both argued, however, that application of inventory accounting as a method of accounting is the same for both financial reporting and tax accounting purposes because both seek to produce a proper matching of income and expense for each accounting period. In their analyses, the standard which requires tax accounting methods to "clearly reflect income" was equated in meaning and application with the "generally accepted accounting principles" standard that applies to financial accounting.

Accounting for financial reporting purposes, however, has different objectives than, and is often significantly different from, accounting for federal income tax purposes. Standards applicable to inventory accounting for tax purposes are dictated by statute and income tax regulations.

I.R.C. §§ 446 and 471 govern inventory accounting. Section 446(a) states the general rule for methods of accounting:

Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

Section 446(b) provides an exception:

If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

The applicable Treasury Regulation in section 1.446–1(a)(1) defines "method of accounting" to include "not only the overall method of accounting of the taxpayer but also the

accounting treatment of any item." Section 1.446–1(a)(2) provides:

It is recognized that no uniform method of accounting can be prescribed for all taxpayers. Each taxpayer shall adopt such forms and systems as are, in his judgment, best suited to his needs. However, no method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income. A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

I.R.C. § 471 states the general rule for inventories:

Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Treas.Reg. § 1.471–1, the implementing regulation on the need for inventories, provides:

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. Merchandise should be included in the inventory only if title thereto is vested in the taxpayer.

I.R.C. §§ 446 and 471 operate in tandem and are mutually consistent. Section 446(b) mandates an accounting method for income tax that "clearly reflects income." Regulations accompanying section 471 establishes two distinct tests to which an inventory must conform: (1) it must conform "as nearly as may be" to the best accounting practice in the trade or business, and (2) it must "clearly reflect the income." Treas.Reg. § 1.471–2(a)(2); *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 532, 99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979).

■ I.R.C. §§ 446 and 471, with their implementing regulations, vest the IRS with broad discretion in applying provisions dealing with inventories. In construing section 446, the Supreme Court has held the IRS "has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner v. Hansen*, 360 U.S. 446, 467, 79 S.Ct. 1270, 1282, 3 L.Ed.2d 1360 (1959). Since the IRS has much latitude, the IRS interpretation of the "clearly reflects income" standard "should not be interfered with unless clearly unlawful." *Lucas v. American Code Co.*, 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930). The IRS disallowance of an inventory accounting method is not to be set aside unless shown to be "plainly arbitrary." *Lucas v. Kansas City Structural Steel Co.*, 281 U.S. 264, 271, 50 S.Ct. 263, 266, 74 L.Ed. 848 (1930).

The Court of Claims has ruled that the taxpayer "has a heavy burden of proof to show a clear abuse of discretion." *Clement v. United States*, 217 Ct.Cl. 495, 580 F.2d 422, 430 (1978), *cert. denied*, 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 455 (1979). The task of a reviewing court

is not to determine whether in its own opinion [the taxpayer's] method of accounting ... "clearly reflect[ed] income," but to determine whether there is an adequate basis in law for the Commissioner's conclusion that it did not.

*RCA Corp. v. United States*, 664 F.2d 881, 886 (2d Cir.1981), *cert. denied*, 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982). *See also American Fletcher Corp. v. United States*, 832 F.2d 436, 438 (7th Cir.1987). Under this precedent, the IRS's characteriza-

tion of Rotable Spare Parts as inventory must be sustained unless such determination was so contrary to the applicable I.R.C. provisions and Treasury Regulations as to be arbitrary and an abuse of discretion.

In *Thor Power*, the Supreme Court considered in detail the reasons the "clearly reflects income" standard is not the same as "generally accepted accounting principles" (GAAP). 439 U.S. at 538–44, 99 S.Ct. at 784–87. The Court's analysis of Treas.Reg. §§ 1.446–1(a)(2) and 1.471–2(b) determined there was no presumption that "an inventory practice conformable to 'generally accepted accounting principles' is valid for income tax purposes." 439 U.S. at 539–40, 99 S.Ct. at 784–85. The following extracts from the *Thor Power* opinion trace the Court's analysis and conclusion:

> Most importantly, the Code and Regulations give the Commissioner broad discretion to set aside the taxpayer's method if, "in [his] opinion," it does not reflect income clearly. This language is completely at odds with the notion of a "presumption" in the taxpayer's favor. The Regulations embody no presumption; they say merely that, in most cases, generally accepted accounting practices will pass muster for tax purposes. And in most cases they will. But if the Commissioner, in the exercise of his discretion, determines that they do not, he may prescribe a different practice without having to rebut any presumption running against the Treasury.

> \* \* \* \* \* \*

> "[W]e are mindful that the characterization of a transaction for financial accounting purposes, on the one hand, and for tax purposes, on the other, need not necessarily be the same." *Frank Lyon Co. v. United States*, 435 U.S. 561, 577 [98 S.Ct. 1291, 1300, 55 L.Ed.2d 550] (1978). *See Commissioner v. Idaho Power Co.*, 418 U.S. 1, 15 [94 S.Ct. 2757, 2766, 41 L.Ed.2d 535] (1974). Indeed, the Court's cases demonstrate that divergence between tax and financial accounting is especially common when a taxpayer seeks a current deduction for estimated future expenses or losses. *E.g., Commissioner v. Hansen*, 360 U.S. 446 [79 S.Ct. 1270, 3 L.Ed.2d 1360] (1959)

(reserve to cover contingent liability in event of nonperformance of guarantee); *Brown v. Helvering*, 291 U.S. 193 [54 S.Ct. 356, 78 L.Ed. 725] (1934) (reserve to cover expected liability for unearned commissions on anticipated insurance policy cancellations); *Lucas v. American Code Co., supra* (reserve to cover expected liability on contested lawsuit).

> \* \* \* \* \* \*

> The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. Consistently with it goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets." In view of the Treasury's markedly different goals and responsibilities, understatement of income is not destined to be its guiding light. Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable.

> \* \* \* \* \* \*

> Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty. This is as it should be. Reasonable estimates may be useful, even essential, in giving shareholders and creditors an accurate picture of a firm's overall financial health; but the accountant's conservatism cannot bind the Commissioner in his efforts to collect taxes.

> \* \* \* \* \* \*

> Accountants long have recognized that "generally accepted accounting principles" are far from being a canonical set of rules that will ensure identical accounting treat-

ment of identical transactions. "Generally accepted accounting principles," rather, tolerate a range of "reasonable" treatments leaving the choice among alternatives to management. Such, indeed, is precisely the case here. Variances of this sort may be tolerable in financial reporting, but they are questionable in a tax system designed to ensure as far as possible that similarly situated taxpayers pay the same tax. If management's election among "acceptable" options were dispositive for tax purposes, a firm, indeed, could decide unilaterally— within limits dictated only by its accountants—the tax it wished to pay. Such unilateral decisions would not just make the Code inequitable; they would make it unenforceable.

439 U.S. at 540–44, 99 S.Ct. at 785–87 (alterations in original) (footnotes omitted).

From the foregoing, it is clear that the IRS possesses considerable latitude in a determination of whether a particular method of accounting clearly reflects income. Further, I.R.C. § 471 provides broad authority to the IRS to decide when inventories are required and to require a change to a method that in its opinion, does clearly reflect income.

■ Whether the particular accounting method employed in a given case clearly reflects income is a question of fact. *Coors v. Commissioner*, 60 T.C. 368, 394, 1973 WL 2682 (1973), aff'd sub. nom. *Adolph Coors Co. v. Commissioner*, 519 F.2d 1280 (10th Cir. 1975). In general, a method of accounting clearly reflects income if it results in accurately reported taxable income under a recognized method of accounting. *Wilkinson– Beane, Inc. v. Commissioner*, 420 F.2d 352, 354 (1st Cir.1970), *aff'g* 28 T.C.M. (CCH) 79, 1969 WL 1099 (1969). If the taxpayer's method of accounting is explicitly authorized by the Internal Revenue Code, or by the regulations, the IRS may not reject that method as not providing a clear reflection of income if the taxpayer has applied that method on a consistent basis. *Hallmark Cards, Inc. v. Commissioner*, 90 T.C. 26, 31, 1988 WL 64 (1988).

Treas.Reg. § 1.471–1 requires inventories "in every case in which the production, pur-

chase, or sale of merchandise is an income producing factor." Accordingly, inventories are necessary in most mercantile, manufacturing, wholesale or retail businesses, or service establishments in which there is a charge for parts, materials or components.

The depreciation allowance does not apply to inventories or stock in trade. Treas.Reg. § 1.167(a)(2) provides:

Tangible Property.—The depreciation allowance in the case of tangible property applies only to that part of the property which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence. The allowance does not apply to inventories or stock in trade, or to land apart from the improvements of physical development added to it.

Both parties presented reports and testimony from expert witnesses to support their respective positions on accounting for Apollo's Rotable Spare Parts pool. Plaintiff's expert witnesses were Irving A. Plotkin and James E. Wheeler. Plotkin was recognized as an expert in Microeconomics, Economics, Financial Accounting and Accounting Principles. His report "Today We Have Accounting for Parts" is dated August 1993. Wheeler was recognized as an expert in Financial Accounting and Tax Accounting. His "Expert Witness Report" is dated September 2, 1993.

Defendant's expert witnesses were W. Eugene Seago and Dennis J. Gaffney. Seago was recognized as an expert in Accounting, Tax Accounting, and Inventory Accounting. His "Expert Witness Report" is dated August 31, 1993. Gaffney was recognized as an expert in Financial Accounting and Tax Accounting. His "Expert Witness Declaration" is dated September 2, 1993.

The tasks assigned to the experts were narrowly tailored and designed to support counsels' respective concepts of the facts and law applicable the accounting issue. Plaintiff's experts emphasized accounting for parts used in services provided under a System Maintenance Agreement; defendant's experts emphasized parts used in services provided in RTF under the Shared Maintenance Agreement and in T & M. There was gener-

al agreement among the experts on the principle that the matching concept (matching of costs with revenues produced) is the cornerstone of accrual accounting. The experts for each party reached contrary positions on how this concept applies. Plaintiff's experts contended only a capitalization and depreciation method of accounting for the pool would produce the required matching of contract maintenance revenue and related expense. Defendant's experts counter that matching requires revenues to be matched to the period they are earned and costs to be matched to the period in which they cease to provide utility to the entity—expenses need not be matched with specific revenues—revenue and expense recognition need not occur simultaneously.

All of the experts used hypothetical examples to illustrate their respective concepts of how the matching concept should be applied. None of the experts presented examples based upon documentary information of specific transactions that occurred in Apollo's maintenance/repair business in the period 1981 (when Apollo was first organized as a corporation) to 1985 (the last year in issue). None of the experts presented examples that utilized documentary information provided by Apollo to the IRS in the audit of the years in issue. Indeed, Plotkin utilized ten pages of a 32–page report on an analysis of a hypothetical market to determine the fair market value in sales of broken parts removed from customer-owned computers. The "sellers" in this theoretical market were buyers of Apollo computers. Such a market could not exist in the "real" world. Wheeler also questioned whether there was a market for a broken part. He posed the following question: Who is interested in broken parts? Answer, only those who can repair and then reuse or sell them.

■ The hypothetical situations erected by the experts, while intellectually stimulating, do not illuminate the accounting actions required by the specific facts in this case. Tax consequences should follow from events which actually occur, rather than extreme events that possibly might occur. *Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 148–49, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974).

■ Each of the expert witnesses possessed outstanding credentials. Their professional experience brought a wealth of technical knowledge and intellectual insight to the accounting issue that was useful in the resolution of this case. The ability to conjure up a parade of horribles on the basis of arcane economic principles, simplistic hypothetical factual relationships, or tailor-made speculative projections, however, is not adequate to establish a description that defines Apollo's business practices in the tax years. In these circumstances, definition of the weight of expert opinion as to the ultimate conclusion is appropriate. A trier of fact is not bound to accept expert opinion, even if it is uncontradicted. *Del Mark Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1325 (Fed.Cir.1987). The judgments of an expert can be no better than the soundness of the reasons that stand in support of them. *Fehrs v. United States*, 223 Ct.Cl. 488, 620 F.2d 255, 265 (1980). Uncontradicted opinion testimony is not conclusive if it is intrinsically nonpersuasive. *Sternberger v. United States*, 185 Ct.Cl. 528, 401 F.2d 1012, 1016–17 (1968).

■ GAAP is a product of development over time. The principles are dynamic reactions to practices crafted by ingenious entrepreneurs and their advisors in a rapidly changing commercial world. Much of GAAP represents responses to emerging new types of transactions, instruments and practices. Determination that a particular accounting principle is generally accepted is difficult because no single reference source exists for all such principles.[6]

---

6. The American Institute of Certified Public Accountants (AICPA), the organization that speaks for the accounting profession, ranks the sources of GAAP, and the relative weights of authority accorded to sources in that ranking. AICPA Auditing Standards Board, "Statement on Auditing Standards No. 69," 1991, ¶¶s 10–15. GAAP hierarchy, in order of descending importance, is summarized as follows:

I. Established Accounting Principles
(a) (i) Financial Accounting Standards Board (FASB) Statements of Financial Accounting Standards and Interpretations,

GAAP applies to financial statements of entities other than governmental agencies. Clear reflection of income is the standard in income tax accounting that recognizes costs, when it is reasonably possible to do so, on the basis of actual consumption, rather than on allocations based on assumptions and estimates. The fact that a tax accounting method is consistent with GAAP, does not of itself satisfy the "clearly reflects income" standard.

The accounting profession is not willing to agree that federal tax law establishes standards required for acceptable financial accounting. The accounting profession has not accepted tax accounting depreciation concepts for financial reporting purposes. Plaintiff's experts' contend that Apollo's financial reports for Rotable Spare Parts, in the relevant years, were in accordance with GAAP and therefore satisfied the "clearly reflects income" standard that is required in reports for income tax accounting purposes. This contention is neither accurate nor persuasive.

Plaintiff's experts contend that, in accordance with GAAP, Apollo's maintenance/repair activities did not include an inventory of parts held for sale to customers in the ordinary course of business. Defendant's experts take the opposite position and argue that parts in Apollo's Rotable Spare Parts pool were merchandise held for exchange or sale in the normal course of business.

The circumstance that able accounting experts could reach such polarized opinions on Apollo's accounting for parts used in its maintenance/repair business on customer-owned computers is to be expected. The polarity reflects the ambivalence that existed in the industry. The computer manufacturers did not have uniform practices in accounting treatment of maintenance/repair services. Further, from 1976 through 1984, the IRS personnel at the district level and in the ISP were equally ambivalent as to the accounting treatment to be recognized for rotable spare parts in the computer industry.

In 1976, in their income tax returns, seven of the 12 leading companies providing computer maintenance/repair service used a type of fixed asset method to report rotable parts and five used a type of inventory method. By 1985, five of the ten leading companies used a type of inventory method for tax reporting purposes. There is no suggestion that the companies that used the inventory method in their tax returns experienced either hardship in providing maintenance/repair services to their customers, or accounting difficulties in matching costs to revenues. Half of the computer maintenance/repair businesses believed, contrary to plaintiff's experts, that the inventory method matched costs to revenues and satisfied the "clearly reflects income" standard.

The parties do not recognize a common definition of a "sale." Apollo considered a sale of a computer part only could be made when there was a transfer of a part for cash from a separate manufacturing inventory. A transfer of a part from Apollo's Rotable Spare Parts pool was not seen as a sale because, in addition to a cash fee, a defective

     (ii) Accounting Principles Board (APB) Opinions, and
     (iii) AICPA Accounting Research Bulletins.
  (b) (i) FASB Technical Bulletins,
     (ii) AICPA Industry Audit and Accounting Guides, cleared by the FASB, and
     (iii) AICPA Statements of Position.
  (c) (i) AICPA Accounting Standards Executive Committee (AcSEC) Practice Bulletins cleared by the FASB, and
     (ii) Consensus positions of the FASB Emerging Issues Task Force.
  (d) (i) AICPA accounting interpretations and implementation guides ("Qs and As") published by the FASB staff, and
     (ii) Practices that are widely recognized and prevalent either generally or in the industry.

II. Other Accounting Literature
This category includes (depending on its relevance in the circumstances):
  (a) FASB Statements of Financial Accounting Concepts.
  (b) APB Statements.
  (c) AICPA Issue Papers.
  (d) International Accounting Standards of the International Accounting Standards Committee.
  (e) Governmental Accounting Standards Board (GASB) Statements, Interpretations, and Technical Bulletins.
  (f) Pronouncements of other professional associations or regulatory agencies.
  (g) AICPA *Technical Practice Aids*.
  (h) Accounting textbooks, handbooks and articles.

part was received in exchange, which after repair replaced the Rotable Spare Part taken from the pool.

■ The term "sale" is used in the I.R.C. without limiting definition or legislative history which indicates a result different from its common and ordinary meaning. *Commissioner v. Brown,* 380 U.S. 563, 570–71, 85 S.Ct. 1162, 1165–66, 14 L.Ed.2d 75 (1965). For federal income tax purposes, the Supreme Court has defined a "sale" as "a transfer of money for a fixed price in money or its equivalent." *Id.*

■ Where a sale of merchandise is an income-producing factor, inventories are required. There is general agreement among the parties, and the Tax Court in *Honeywell,* that if Apollo's maintenance/repair services fall within the meaning of section 1.471–1 of the regulations, plaintiff would be required to treat as inventory its Rotable Spare Parts that were placed in its customer-owned computers and would not be allowed to depreciate the cost of the pool. *Honeywell,* 64 T.C.M. at 444.

■ Whether Apollo's Rotable Spare Parts were acquired and held for sale is a factual question to be decided after taking into account all of the surrounding facts and circumstances. *Honeywell,* 64 T.C.M. at 445. One factor to be considered in determining whether a sale has occurred for federal income tax purposes is whether title has passed. *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1237, 1981 WL 11305 (1981). While no single factor is controlling, passage of title is perhaps the most significant factor to be considered, although the transfer of possession is also significant. The passage of title and the risk of loss to the buyer constitutes the very heart of a sale. *Hallmark Cards, Inc. v. Commissioner,* 90 T.C. 26, 32–34, 1988 WL 64 (1988).

■ Generally, where the price for services includes the cost of merchandise in a mixed service and merchandising business, the merchandise must be inventoried. 2 J. Mertens et al., *Mertens Law of Federal Income Tax* § 16.04, at 20 (July 1994). Treas. Reg. § 1.471–1 is not inapplicable merely because Apollo provided both goods and services in its maintenance/repair business. A single undifferentiated price for a complete transaction that includes both merchandise and services can be a sale of merchandise. *Wilkinson–Beane, Inc.,* 420 F.2d at 354–55. *See Surtronics, Inc. v. Commissioner,* 50 T.C.M. (CCH) 99, 1985 WL 14904 (1985) (metals used in electroplating service business were inventory when included in a single service charge).

On the facts and circumstances presented to the Tax Court by *Honeywell* about the operation of its 1980–81 rotable parts pool, the court found that a maintenance/repair swap transaction was the sale and purchase of a service, and not of a service and a product. The court concluded that rotable parts in Honeywell's replacement parts pool that were used to service customer-owned computers were not acquired and held for sale, and were not merchandise within the meaning of Treas.Reg. § 1.471–1. Accordingly, Honeywell was not required to treat such parts as inventory. The few instances where Honeywell sold parts from the replacement parts pool did not compel a contrary conclusion. Apollo has not presented information on the record in this case that would permit such a finding and conclusion.

■ In a tax refund case, the Court of Federal Claims makes a de novo review of the evidence adduced to support the plaintiff's case. *Warren Corp. v. United States,* 135 Ct.Cl. 305, 141 F.Supp. 935, 940 (1956). The court's role is to review all of the disputed operative evidence in the record to determine whether the taxpayer's method of accounting clearly reflects income. *Mulholland v. United States,* 28 Fed.Cl. 320, 333–34 (1993). Plaintiff has the burden to show that the income tax return for the relevant year on its maintenance/repair business complied with the I.R.C. and income tax regulations. This burden requires plaintiff to prove not only compliance with statute and regulation, but also to show the amount of tax properly owed. *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Eli Lilly & Co. v. United States,* 178 Ct.Cl. 666, 372 F.2d 990, 997 (1967).

The record shows that Apollo at its Manufacturing Facility produced computers that contained three types of parts: (a) complex proprietary parts produced by Apollo that could not be obtained from other sources, (b) standardized parts made by and purchased from other manufacturers, and (c) expendable parts purchased from outside supplies. There is no dispute that newly manufactured computers and new parts for Apollo computers were inventory. Apollo contends that all sales of parts from this newly manufactured inventory were made only in the manufacturing operation. The record does not contain any evidence to show where such sales occurred, or the volume of transactions or dollar amounts for such sales.

The trial record does not contain a price list for Apollo produced parts available for purchase from the manufacturing operation for any of the years in issue.[7] The only price list in the trial record for any of the types of parts contained in Apollo's computers is a document captioned:

APOLLO

SPARE PARTS PRICE LIST

for

Continental United States

Effective January 1, 1986 to March 31, 1986

This price list is for 1986 operations. Testimony at trial indicated that a comparable document probably existed and was available for 1984 and 1985. Apollo contends this document was for internal use only. A copy, however, apparently was provided to an OEM.

Apollo's price list contains columns headed: "Apollo Part No." and "Description" which include parts that are produced by Apollo as well as parts obtained from other manufacturers. This document also contains a column headed "($) List Price." Presumably, but not established on the record, the list price was the newly manufactured part price.

The record does not contain a description in detail of Apollo's accounting treatment for sales of newly produced parts. Nor does the record contain documentary support (invoices or specific inventory accounts) that such sales actually occurred at the Manufacturing Facility.

Apollo's Manufacturing Facility produced all of the parts that were transferred to the repair facility, which was responsible for contracts in its maintenance/repair business. These transfers were reflected on Apollo's books and records as intracompany transfers of assets at standard manufacturing costs. The record does not show the transfer cost for a particular part for any of the years in issue.

The price list in evidence has columns with the following headings: "($) RTF Repair Charge" and "($) T & M Exchange Price." These columns stated the service charge for time and the price for a part when the transaction involved a T & M exchange, as well as and remedial repairs for a customer out of inventory or with a customer otherwise not covered by a System Maintenance Agreement, or an RTF exchange with an OEM.

Whether the T & M and RTF transactions are termed "exchanges" of parts or "sales" of parts is not determinative of their substance from the totality of the circumstances. There was a separate charge for personal service and a separate cash charge for materials, which sometimes included an Apollo manufactured Rotable Spare Part. The price for the exchange service was directly related to the particular part needed.

Specific information as to the number of T & M transactions in 1983, 1984 and 1985 is not in the record, nor does the record disclose the part involved or the dollar value of

7. In the summary judgment proceedings, defendant's Appendix B included an Exhibit 11 that was captioned "Product, Maintenance, and Installation Price List" for "Domain System Nodes, Options and Peripherals." This document, effective June 15, 1984, listed items by "Model Number," "Description," gave a "List Price," "Monthly Maintenance Charge (MMC)," and "Field Installation Charge (FIC)." This list was identified in defendant's motion papers as a published list of a supply of new parts used for manufacturing and sale to end-users and OEMs, which for federal tax purposes were accounted for as inventory. Neither party offered this price list into evidence at trial, and it was not referenced in posttrial briefing.

each transaction for each of the years in issue. Such information would be available from the service technician's job reports and the year-end accounts that consolidate such reports.

Testimony at trial indicates that in 1984 and 1985, Auto-trol's use of RTF service averaged one or two transactions per month. RTF transactions amounted to less than one percent of total service revenue. In 1985, on the basis of Apollo's financial reports to the SEC, RTF revenue amounted to approximately $337,000. The record does not disclose the part involved or the dollar value of each transaction. As with the T & M transactions, such information would be contained in the service technician's job reports and the year-end consolidating accounts.

During the years in issue, T & M repairs accounted for no more than 2½ percent of Apollo's computer maintenance/repair business. This amounted to approximately $843,-000 in 1985. Combined T & M and RTF service amounted to $1,180,000 in 1985. In any context, such amount is not insignificant.

Apollo emphasizes that a Rotable Spare Parts pool was essential to sales of new computers and to earn revenue from its maintenance agreements. The pool provided parts that were used as diagnostic tools to isolate a problem in a customer's malfunctioning computer. Descriptions of how diagnostic testing was performed, however, does not limit such use to Apollo manufactured Rotable Spare Parts, or even to a pool of Apollo manufactured Rotable Spare Parts.

When a service technician in a regional maintenance facility received a "hotline" telephone call from a customer with a malfunctioning computer, the technician would query the customer about the computers internal diagnostic software in an attempt to identify the problem by a computer model and associated parts. The service technician then would select the type of parts he believed to be necessary to correct the malfunction, and take those parts to the customer's premises. Parts to be used as diagnostic tools necessarily would have to include: (a) parts made by Apollo in its manufacturing facility (parts such as the central processor circuit board and the memory circuit board, for the partic-ular computer model), (b) standardized parts obtained by Apollo from other manufacturers (such as disk drives, power sources, and keyboards used in the particular computer model), and (c) expendable parts (such as cables and screws). Since the malfunctioning part was unknown, for diagnostic testing to result in an operative computer a substantial array of parts would be needed. Through a trial and error swapping of parts, the service technician ultimately would locate the cause and correct the malfunctioning computer. Some of the parts taken to the customer's premises were used by the service technician. Some were left in the customer's computer, in exchange for parts thought at that time to be broken.

It is clear that diagnosis of any particular malfunction in a customer's computer could not be located and corrected by any specific Rotable Spare Part that had been transferred to the Repair Facility from the Manufacturing Facility. Nor would a pool of Apollo manufactured Rotable Spare Parts be sufficient to diagnose any particular malfunction in a customer's computer. The diagnosis testing procedure required a mixture of non-rotable and rotable parts, some of which were not made by Apollo's Manufacturing Facility.

It is obvious that such a mixture would not comply with the criteria for a mass asset eligible for depreciation. A mass asset is a group of individual items of property each of which is minor in value relative to the total value of the group, usually accounted for only on a total dollar or quality basis, and which is impractical to identify and account for separately. Treas.Reg. § 1.47–1(e)(4). Many of Apollo's Rotable Spare Parts were relatively costly items, carried serial numbers and in fact were tracked physically through three repairs. Further, even if such a mixture had utility in diagnostic testing, such usage would not be determinative of whether the fixed asset method of accounting clearly reflected income from Apollo manufactured Rotable Spare Parts.

Clearly, parts used as tools in the diagnosis procedure were not limited to Rotable Spare Parts. The customer, however, paid a

fee that covered the service technician's time and the parts that were used in the transaction. That information would be shown on the service technician's job reports and year-end accounts that consolidated the reports.

The initial purchase price of a computer under warranty among other items, included the cost of diagnostic testing. The monthly fixed fee in a System Maintenance Agreement, among other items, included the cost of diagnostic testing. In neither case would the income from the maintenance/repair business be dependent on the availability of a pool of Apollo manufactured Rotable Spare Parts.

The record does not establish for any of the relevant years what rotable and nonrotable parts were contained in the pool used for diagnostic testing. Nor does the record contain information that identifies, quantifies, or gives the dollar value of parts transferred from the manufacturing facility and used for diagnostic testing.

Plaintiff asserts that its fixed asset method of accounting is supported by analogy to the function performed by the "line pack" in *Transwestern Pipeline Co. v. United States,* 225 Ct.Cl. 399, 639 F.2d 679 (1980). A pool that contained a mixture of rotable and non-rotable parts, while it would facilitate diagnostic testing, is not analogous to and does not serve the same function as the "line pack" in a gas transmission line or "cushion gas" in a gas storage facility. A gas pipeline cannot transmit gas without a "line pack" and a gas storage facility cannot perform its function in the absence of "cushion gas" to provide the minimum pressure required for gas reservoir operations. Usage of Apollo manufactured Rotable Spare Parts as a diagnostic tool does not determine Apollo's ability to function as a marketer of computers or its ability to operate a maintenance/repair business.

With respect to both "line pack" and "cushion gas," the portion of gas that was recoverable on termination or abandonment was inventory and not depreciable. See *Arkla Inc. v. United States,* 37 F.3d 621 (Fed. Cir.1994). Additional reasons Apollo's Rotable Spare Parts are not analogous to "line pack" and "cushion gas" are: (a) the mixture of items in the pool is not a collection of identical items; (b) Rotable Spare Parts are scrapped after three repairs, not on termination or abandonment of the business, and (c) recoverability as to the time the parts were available for sale was not an issue.

Apollo used Rotable Spare Parts for a variety of diverse purposes: warranty work (a normal function of inventory), System Maintenance Agreement work, Time and Materials work, and RTF work. This diversity of uses for Apollo's rotable parts is inconsistent with the common purpose concept of a pool. The Rotable Spare Parts held and used for T & M and RTF for remedial repairs must be classified as items held for sale. The notion that a single pool, could, at the same time, be part inventory and part something else, is inconsistent with the requirement that items in a group account have a common function.

The parties to a System Maintenance Agreement were bargaining for the same thing: parts and labor for money and other property. The fact that the number of parts which might be required to keep a specific computer operating over the term of a single maintenance agreement was unknown, or the fact that the parties agreed to a price for providing whatever number of parts might be required to keep a computer in working order, does not alter the situation. Apollo and its customers essentially struck a deal at the price each believed represented a fair guess as to what the cost of parts and labor would be. It does not follow that the amount charged under a Systems Maintenance Agreement was unrelated to the cost of the parts.

While it is possible that the replacement usage of Apollo's Rotable Spare Parts may be predicted by statistical methods, the replacement usage of any individual part is not necessarily on a rigidly scheduled basis. It occurs more or less on a random basis.

After examination of plaintiff's 1983–85 income tax returns, the IRS auditor's report included the following conclusions about Apollo's maintenance/repair business:

> Spare parts used to service Apollo's customers satisfy the criteria for inventory

treatment. These rotable parts are held in disposition in a transaction that generates gross income. The fact that the compensation for the maintenance contract reflects a payment for a mixture of service and goods in no way detracts from the fact that a sale of goods is an income-producing factor in the transaction. . . .

In this court, plaintiff's claim for a refund is a proceeding de novo; it is not an administrative review of agency action. The record in this case, notwithstanding the paucity of information on specific types of transactions, supports the accuracy of the auditor's conclusion.

One of the most significant factors in an analysis of whether a sale has occurred is the ownership of the underlying equipment for which Apollo held its Rotable Spare Parts. The parts were installed in computers owned by Apollo's customers. Significant benefits and burdens of ownership passed to the customer when Apollo's service technician exchanged a fully operational part for a malfunctioning part. Title in the operational part, and all other property rights, the essence of a sales transaction, shifted at that time. Accordingly, the Rotable Spare Parts were inventory items used by Apollo in conducting its maintenance/repair business.

Plaintiff has not shown that the fixed asset method of accounting for Rotable Spare Parts used in its tax returns for 1983, 1984 and 1985 complied with the I.R.C. and income tax regulations that applied to the manufacture, marketing and service of its computers. The fixed asset method of accounting reported in plaintiff's tax returns did not meet the tax accounting "clearly reflects income" standard for the years in issue. Rotable Spare Parts primarily were held for sale to customers in the ordinary course of the maintenance/repair segment of its business and properly should have been reported as inventory in the income tax returns.

The decision of the IRS to require the use of the inventory method of accounting for Rotable Spare Parts accorded with applicable provisions of the I.R.C. and Treasury Regulations. It was not clearly unlawful or plainly arbitrary and was not an abuse of discretion. Plaintiff is not entitled to a refund of depreciation deductions and investment tax credits.

*I.R.C. § 7805(b) claim*

■ In the complaint and at trial, Apollo alternatively claims that, in the event of a determination that Rotable Spare Parts should be accounted for on an inventory-based method, the IRS denial of its request for relief under I.R.C. § 7805(b) from retroactive application of such ruling was an abuse of discretion. At trial, information on the section 7805(b) issue was provided through the testimony of two fact witnesses and in IRS documents obtained through the Freedom of Information Act (FOIA). The fact witnesses were the Tax Director of Apollo, and the Industry Specialization Coordinator for the Data Processing Industry in the ISP. The Tax Director had worked for Apollo from 1982 through 1987, was a CPA, and had prepared Apollo's tax returns for the relevant years. The Data Processing Industry Coordinator was an IRS agent from 1961 until retirement in 1968, and an Industry Coordinator in the ISP from 1981 to 1986.

Plaintiff claims that its tax returns for each of the years in issue were prepared in reliance on the IRS district task force recommendation in the Brown Report that rotable spare parts be capitalized and depreciated in the same manner as spelled out in Rev.Rul. 69–200 and Rev.Rul. 69–201, and the adoption in 1979 of that recommendation in the initial ISP Issue Paper for the Data Processing Industry. Plaintiff contends that it did not know that the IRS had changed its position on the proper accounting treatment from the Brown Report's recommendation until after the tax returns had been filed for 1983, 1984 and 1985, and that the IRS position, in fact, still was under reconsideration at the beginning of Apollo's audit in April 1986.

After receipt of the change to an inventory method of accounting in the 90–day deficiency notice on September 16, 1988, plaintiff filed on June 20, 1989, a request for relief under section 7805(b) on June 20, 1989, that the change be on a prospective basis only. That request stated that plaintiff had relied on Rev.Rul. 69–200 and that it would be prejudiced if it were required to reconstruct

its accounting records on an after-the-fact basis. Relief under section 7805(b) was denied by letter dated January 31, 1991. Plaintiff's request was addressed to the Associate Chief Counsel (Technical) of the IRS, and the reply was signed by the Chief, Branch 5, for the Acting Assistant Chief Counsel (Income Tax and Accounting).

I.R.C. § 7805(a) authorizes the Secretary to prescribe "all needful rules and regulations for the enforcement" of the internal revenue code, including "all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue." Section 7805(b) provides:

> (b) Retroactivity of Regulations or Rulings.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

Treas.Reg. § 301.7805–1(b) provides that the Commissioner may prescribe the extent, if any, to which any ruling relating to the internal revenue laws issued by or pursuant to authorization from him, shall be applied without retroactive effect.

Numerous courts have recognized that the authority conferred in section 7805(b) "establishes a presumption that regulations are to be applied retroactively." *Gehl Co. v. C.I.R.,* 795 F.2d 1324, 1331 (7th Cir.1986) and cases there cited. The presumption of retroactivity rests on the concept that the regulation merely declares what the statute meant all along. The regulation is not authority independent of the statute, but is an interpretation of the statute made by the agency responsible for carrying out its purpose.

█ A court can review, under an abuse of discretion standard, the IRS decision not to limit the retroactive effect of a regulation. Relevant considerations include whether or to what extent a taxpayer justifiably relied on prior settled law that is altered by regulation, and whether retroactive application of the regulation would create an inordinately harsh result. *Gehl,* 795 F.2d at 1332.

By its terms, section 7805(b) applies only to "rulings and regulations." Plaintiff's request for relief does not fit the type of fact situation at which the statute is directed. Section 7805(b) applies when there is a ruling or regulation which essentially preempts or modifies a former position taken by the IRS in another ruling or regulation. The Brown report and the ISP Issue Papers were informal IRS publications, not formally promulgated rulings or regulations. The situation in this case is one where a revenue ruling supplanted a prior informal position developed by the district task force and the ISP.

█ Informal IRS publications and pamphlets, including revenue rulings, are simply guides to taxpayers. Taxpayers who rely on them do so at their own peril. *Caterpillar Tractor Co. v. United States,* 218 Ct.Cl. 517, 589 F.2d 1040, 1043 (Ct.Cl.1978); *see also CWT Farms, Inc. v. Commissioner,* 755 F.2d 790, 804 (11th Cir.1985), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562 (1986). Most revenue rulings are private matters that affect only the rights of the taxpayer involved. A taxpayer to whom a ruling is issued is normally entitled to rely on it fully on issues presented to and considered by the IRS. *See Lesavoy Foundation v. Commissioner,* 238 F.2d 589, 591–92 (3d Cir. 1956); 2 J. Mertens et al., *Mertens Law of Federal Income Tax* § 49.95 (Nov. 1987).

█ In some instances, however, revenue rulings occupy a special status in IRS informal publications. Some rulings are published for the specific purpose of giving guidance to taxpayers. When a ruling is invoked by another taxpayer, its precedential effect turns on whether the ruling is published. Published Revenue Rulings appear in the Internal Revenue Bulletin. The Introduction to the Cumulative Bulletin, the bound compendium of IRS Bulletins, explains that "[i]t is the policy of the Service to publish in the Bulletin all substantive rulings necessary to promote a uniform application of the tax laws. . . ." It notes that "[r]ulings . . . reported in the Bulletin do not have the force and effect of Treasury Department Regulations, but they may be used as precedents." *See, e.g.,* 1984–3 C.B. at iii. While taxpayers generally may rely upon published revenue rulings in determining the tax treatment of their own transactions, such reliance is war-

ranted only when the taxpayer's facts and circumstances are substantially the same as those described in the revenue rulings.

Apollo never requested or received a private letter ruling with regard to the manner in which it accounted for rotable spare parts in its tax returns for the years in issue. Rev.Rul. 69–200 has never been officially revoked or modified by the IRS.

Plaintiff argues it relied on Rev.Rul. 69–200. That ruling on its facts is not apposite to Apollo's use of Rotable Spare Parts. Also, it represents an exception to the general rule that replacement parts, whether or not rotable, are inventory items.

In Rev.Rul. 69–200, 1969–1 C.B. 60, the taxpayer was an airline that maintained a stock of rotable spare parts and consumable supplies for use in repairing its aircraft. The airline, at the same time it acquired a new type of aircraft purchased a substantial number of flight equipment rotable parts and maintenance assemblies that were designed specifically for use with such aircraft. The maintenance of a stock of rotable spare parts was essential to maintain aircraft operations. The ruling held that the cost of the rotable spare parts represented capital expenditures and that these parts could be depreciated beginning at the time they were acquired.

The airlines in Rev.Rul. 69–200 were not manufacturers. Airlines are in the business of operating aircraft to transport passengers and cargo; they are not in the business of selling rotable parts and maintenance assemblies.

Plaintiff relies on *Gehl Co.* to support its contention that reliance on the informal IRS statements in the Brown Report and ISP Issue Papers satisfy the requirements for relief under section 7805(b). Plaintiff ignores the important difference on which the *Gehl Co.* decision rested. Under the facts of that case, the IRS had issued a Handbook that specifically promised that the

"Service will follow the rules and procedures set forth in this part until such time as they may be modified in regulations or Treasury publications," and that "[a]ny such modifications which may be adverse to taxpayers will apply prospectively only."

*Gehl Co.,* 795 F.2d at 1333 (footnote omitted).

This was seen as a special statement on retroactivity and a specific promise designed to elicit reliance on the part of taxpayers. It contrasted with a typical publication which may well say nothing on the issue of the retroactivity of future changes. The court noted "[n]ot only did this promise reasonably induce reliance; the promise was originally made specifically to create such reliance. To allow the Treasury to renege on such express promises with impunity is grossly unfair." *Gehl Co.,* 795 F.2d at 1333.

Apollo and other manufacturers in the computer industry in fact received guidance from the Brown Report and the ISP Issue Papers. Nothing comparable to a promise, however, exists in those informal documents.

In addition, the IRS change in its position on rotable spare parts was announced on March 29, 1985, in a National Office Technical Advice Memorandum. Tech.Adv.Mem. 85–28–006 (Mar. 29, 1985). At trial, Apollo's Tax Director could not recall the issuance of this publication. Apollo's tax returns for 1984 and 1985 were filed after that date.

In view of the foregoing, the IRS denial of relief under section 7805(b) was not an abuse of discretion. Denial of the request was appropriate on the facts and consonant with controlling precedent.

Conclusion of Law

In the bench ruling made on March 12, 1993, after oral argument on cross-motions for partial summary judgment, defendant's motion was allowed. Apollo is not entitled to a refund with respect to its claim on the DISC issue.

For the reasons stated in this opinion, Apollo is not entitled to refund of depreciation, deductions and investment tax credits, and interest, that were assessed on January 31, 1989, and paid to the IRS on February 16, 1989, on the Rotable Spare Parts issue.

The IRS denial of Apollo's request for relief under I.R.C. § 7805(b) was not an abuse of discretion. There are no special circumstances in this case that would justify relief under that section.

Accordingly, the Clerk is directed to dismiss the complaint. No costs.