**HEWLETT–PACKARD COMPANY and subsidiaries, successor to Apollo Computer, Inc., and subsidiaries, Plaintiffs–Appellants,**

v.

**The UNITED STATES, Defendant–Appellee.**

No. 95–5044.

United States Court of Appeals,
Federal Circuit.

Dec. 7, 1995.

Robert T. Carney, Rogers & Wells, Washington, DC, argued for plaintiffs-appellants.

Charles Bricken, Department of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General, Gary R. Allen and Teresa E. McLaughlin.

Before ARCHER, Chief Judge, FRIEDMAN, Senior Circuit Judge, and MAYER, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

The question in this tax-refund case, here on appeal from the United States Court of Federal Claims, is whether the appellant's predecessor correctly treated, for federal income tax purposes, its pool of rotable spare parts used to repair computers it had sold, as capital assets. The Commissioner of Internal Revenue rejected this treatment and ruled that the assets were inventory. The Court of Federal Claims upheld the Commissioner's action. *Apollo Computer, Inc. v. United States,* 32 Fed.Cl. 334 (1994). We reverse, holding that the company properly treated this pool of parts as capital assets.

I.

This case involves the accounting method that Apollo Computer, Inc. (Apollo), to which the appellant Hewlett–Packard Company is the successor, used for the tax years 1983, 1984, and 1985. During those years Apollo manufactured and sold computers and computer equipment. It also operated a separate repair facility. During that period near-

ly all the repair service that Apollo performed was on Apollo computers of third persons.

In conducting its computer repair business, Apollo maintained a pool of "rotable spare parts," obtained from Apollo's manufacturing facility. These are parts that the company can substitute for an original part that malfunctions. Apollo repairs the original part and returns it to the pool for continued use in the repair business. Apollo kept these rotable spare parts separate from its regular manufacturing inventory and used them only in its computer repair business.

Apollo conducted its repair business under several arrangements. Apollo provided free maintenance of the computers it sold, including parts and labor, during a 90–day warranty period. Customers could enter into a "system maintenance agreement," under which Apollo provided parts and labor for a specified period (usually a year) at a fixed total price. Some of Apollo's customers, who resold computers, entered into "shared maintenance agreements," under which the customers used their own labor to repair their customers' computers, but occasionally used Apollo's parts repair services and rotable spare parts pool by returning a defective part and paying an "exchange price" for a replacement part. Finally, Apollo would provide service on a time and materials basis, for which the customers would pay directly for the labor and an exchange fee for the rotable parts. Approximately 95 percent of Apollo's rotable spare parts usage was attributable to system maintenance agreements and warranty service.

To repair a malfunctioning computer, Apollo typically sent a service technician to the customer's location with a supply of rotable spare parts. Technicians first used these parts for diagnostic purposes: they substituted spare parts for possibly malfunctioning parts until they could determine which original computer parts had failed. The technician then replaced malfunctioning parts with parts from the spare parts pool and returned the malfunctioning parts to the service facility. The company repaired the malfunctioning parts (which it usually could do) and returned them to the pool. Apollo followed the practice of substituting its rotable spare parts in the customer's computer to avoid the computer being inoperative during the time required to repair the original part or to replace the rotable part with the repaired original one.

In its federal income tax returns for the years in issue, Apollo treated its pool of rotable spare parts as a capital asset, which it depreciated and on which it took investment tax credit. On audit, the Commissioner disallowed the depreciation deductions and investment tax credits on the ground that Apollo was required to treat its pool of rotable spare parts as inventory. Apollo paid the assessed deficiencies and, after the Commissioner denied the company's refund claim, filed this refund suit in the Court of Federal Claims.

After trial of the issue here involved, the Court of Federal Claims ruled for the government and dismissed the complaint. Observing that "[g]enerally, where the price for services includes the cost of merchandise in a mixed service and merchandising business, the merchandise must be inventoried," the court held that the Commissioner correctly had determined that Apollo's rotable spare parts pool was inventory, not a capital asset. *Apollo,* 32 Fed.Cl. at 352. The court based this conclusion on its finding that Apollo held these parts for sale. According to the court,

> [o]ne of the most significant factors in an analysis of whether a sale has occurred is the ownership of the underlying equipment for which Apollo held its Rotable Spare Parts. The parts were installed in computers owned by Apollo's customers. Significant benefits and burdens of ownership passed to the customer when Apollo's service technician exchanged a fully operational part for a malfunctioning part. Title in the operational part, and all other property rights, the essence of a sales transaction, shifted at that time. Accordingly, the Rotable Spare Parts were inventory items used by Apollo in conducting its maintenance/repair business.

*Id.* at 356. The court also stated that "the IRS's characterization of Rotable Spare Parts as inventory must be sustained unless such determination was so contrary to the

applicable I.R.C. provisions and Treasury Regulations as to be arbitrary and an abuse of discretion." *Id.* at 347–48.

## II.

Section 446 of the Internal Revenue Code provides that, if

> the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books ... does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.

I.R.C. § 446.

Section 471(a) states the "[g]eneral rule" for inventories:

> Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

I.R.C. § 471(a).

> Treas.Reg. § 1.471–1 provides:

> In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor.

*Id.* The Court of Federal Claims held that Apollo's rotable spare parts were inventory because they "primarily were held for sale to customers in the ordinary course of the maintenance/repair segment of its business." *Apollo,* 32 Fed.Cl. at 356.

The issue before this court is whether the Commissioner properly rejected, as not clearly reflecting income, Apollo's accounting treatment of its rotable spare parts pool as a capital asset which it depreciated, and required the company to treat the pool as inventory. Under Treas.Reg. § 1.471–1, the answer depends on whether the exchange of rotable spare parts for the original parts in Apollo's customers' computers constituted the "sale of merchandise" as an "income-

producing factor." *Id.* As the government stated in its brief: "the controlling question here is whether taxpayer's placement of a rotable part in a customer's computer in the course of providing maintenance or repair service constitutes a sale of that part."

We disagree with the Court of Federal Claims that Apollo's repair operation was a mixed service and merchandising business in which Apollo sold its rotable spare parts to its customers. The undisputed facts show that Apollo's maintenance business was a service business in which it maintained the pool of rotable spare parts in order to provide better service to its customers. In any realistic sense Apollo's substitution of a rotable spare part for a malfunctioning original part in a customer's computer was not a sale of that part to the customer. Accordingly, in the language of the regulation, the "sale of merchandise" was not an "income producing factor" in the conduct of Apollo's repair business.

■ A. Unlike the typical seller, Apollo does not furnish the rotable spare parts to the customer in exchange for or to receive the purchase price. Instead, it does so to enable it to provide better service, *i.e.,* to avoid the additional computer downtime that the customer would suffer if the malfunctioning part were merely repaired without furnishing a replacement or if a replacement were temporarily provided and the repaired original part were then substituted for the replacement.

Under the system maintenance agreements pursuant to which Apollo performed most of its repair work, the customers did not pay for the replacement parts they received. As the tax court stated in *Honeywell Inc. v. Commissioner,* 64 T.C.M. (CCH) 437, 1992 WL 189849 (1992), *aff'd,* 27 F.3d 571 (8th Cir.1994), in describing what the government characterizes as another computer manufacturer's "business of servicing customer-owned computers" through a rotable parts pool that "was not materially different from the service business of [Apollo] here,"

> [t]he fee that petitioner charged was a fixed amount, and petitioner installed parts from its replacement parts pool in a cus-

tomer's computers at no additional charge to the customer. The number of parts that petitioner actually used to repair a specific computer and petitioner's actual cost to comply with the terms of the maintenance agreement did not change the amount of the fee that petitioner charged to that customer.

*Id.* at 445.

The Tax Court further pointed out:

[I]n many instances, the customer was not aware that a part had been removed from its computer and replaced with a rotable part from petitioner's replacement parts pool and the customer apparently would be indifferent as to whether the removed part would actually be returned.... [B]oth petitioner and its customers viewed the transaction as involving the sale and purchase, respectively, of a service and not of a service and a product.

*Id.* at 447.

In determining the price of a service contract, Apollo did not attempt to calculate the cost of the replacement parts it would use in servicing the particular computer. Instead, the only parts-related costs factor that Apollo considered was based on allocating a portion of the depreciation deductions it took on the parts pool as a whole. Moreover, even in the small percentage of instances in which Apollo repaired computers on a time and materials basis, it based the portion of the repair cost attributable to the replaced parts not on the price of the particular parts supplied, but on "the total costs of providing the repair service, including depreciation costs of carrying the Rotable Spare Parts pool and anticipated repair costs for malfunctioning parts."

In a typical inventory situation, the sale of an item out of inventory reduces *pro tanto* the size of the inventory, which normally is replenished only after its size has been significantly diminished. In contrast, in the present case the withdrawal of a part from Apollo's rotable parts pool did not reduce the size of the pool, because that part was replaced with the repaired malfunctioning original part removed from the customer's computer.

In urging that the furnishing of replacement exchange parts was a sale of those parts, the government relies on cases in which goods supplied in conjunction with or as part of providing a service were treated as inventory. *See Knight–Ridder Newspapers, Inc. v. United States,* 743 F.2d 781, 790–91 (11th Cir.1984); *Wilkinson–Beane, Inc. v. Commissioner,* 420 F.2d 352, 355 (1st Cir. 1970); *Fred H. McGrath & Son, Inc. v. United States,* 549 F.Supp. 491, 493–94 (S.D.N.Y.1982); *J.P. Sheahan Assocs., Inc. v. Commissioner,* 63 T.C.M. (CCH) 2842, 1992 WL 80927 (1992); *Surtronics, Inc. v. Commissioner,* 50 T.C.M. (CCH) 99, 1985 WL 14904 (1985). In each of those cases, however, the recipient of the service also received some tangible item that it had not had before, and that item was removed from the service-provider's property.

For example, *Wilkinson–Beane,* which the government describes as "the leading case," involved an undertaking business which provided complete funeral services, including the casket, for a single unitemized price. *Wilkinson–Beane, Inc.,* 420 F.2d at 353–54. "[P]eople select the service desired by choosing among caskets in taxpayer's establishment.... Better caskets are provided with more expensive funerals and therefore serve as inducements for people to pay a higher fee for the complete service." *Id.* at 354. The court upheld the Tax Court's determination that the caskets were "merchandise" that the taxpayer sold rather than "merely incidental supplies necessary to the performance of [the taxpayer's] professional services." *Id.*

In the present case, as we have shown, both Apollo and its customers had the same item before and after the replacement, the only difference being the substitution of a functioning part for a non-functioning one in the customer's computer.

B. The Court of Federal Claims stressed, as does the government here, that title to the substituted rotable part passed to the consumer when the part was installed in the computer. The government argues that the passage of title accompanied by the customer's physical possession of the rotable part (even though the customer may have been unaware of such possession) is sufficient to

show that the substituted part was sold to the customer.

The government cites cases for the proposition that the passage of title constitutes the essence of a "sale." Those cases, however, dealt with the question whether a transaction was a sale even though title did not pass. *See Hallmark Cards, Inc. v. Commissioner,* 90 T.C. 26, 32, 1988 WL 64 (1988); *Grodt & McKay Realty, Inc. v. Commissioner,* 77 T.C. 1221, 1238, 1981 WL 11305 (1981). Those cases show only that normally title must pass for a sale to occur. That passage of title may be required for a sale, however, does not mean that passage of title itself creates a sale where, as here, all other aspects of the transaction point to a contrary conclusion.

In *Transwestern Pipeline Co. v. United States,* 639 F.2d 679, 225 Ct.Cl. 399 (1980), one of our predecessor courts dealt with the question whether property used in operating a business should be treated as a capital asset or inventory. That case involved "line pack" gas, which was put into a natural-gas pipeline when the pipeline began operation. The gas was required to maintain the pressure necessary to operate the pipeline, its volume remained constant, and it was unrecoverable when the operation of the pipeline ended. *Id.,* 639 F.2d at 682, 686–87.

The court rejected the government's contention that the line pack gas constituted inventory held primarily for sale to customers even though "all the natural gas molecules in Transwestern's pipeline system at any given moment of time [were] ultimately destined for delivery to customers." *Id.* at 686–87. The court ruled that consideration of which "specific molecules of natural gas," *id.* at 686, reached the customer was less important than the facts that the line pack remained constant and represented a quantity of gas that was ultimately unrecoverable and that it was necessary for operation of the pipeline.

*Transwestern Pipeline* is of course distinguishable on its facts. Its significance for this case lies in the court's recognition that, in determining whether the line pack gas was held primarily for sale to customers, the facts that the amount of that gas remained constant and that its presence was essential for the operation of the pipeline were more important than the fact of the transfer of molecules of that gas to customers. Similarly, in the present case, it is equally significant that the size of the rotable parts pool did not change as a result of the removal of parts from the pool and their replacement with original equipment parts removed from the customer's computer, and that the maintenance of the pool was essential to Apollo's ability effectively to conduct its computer repair business.

As the Tax Court stated in *Honeywell,* in holding that the company's "fixed asset method of accounting for the costs of establishing and maintaining a pool of rotable parts is supported by the opinion of the Court of Claims in Transwestern," *Honeywell,* 64 T.C.M. (CCH) at 447, "[p]etitioner's pool of rotable parts, in our view, was just as indispensable to the effective operation of petitioner's business as the line pack was to the taxpayer's business in Transwestern Pipeline Co." *Id.* at 448. The Tax Court also pointed out that, as in *Transwestern Pipeline,* the "important consideration" in *Honeywell* was that "the volume of such parts in the pool that was necessary for the operation of petitioner's business did not vary appreciably from the time that the cost was incurred to establish a pool of rotable parts for a particular computer." *Id.*

In sum, Apollo's exchange of parts from its rotable parts pool for malfunctioning parts in its customers' computers was not a sale of those rotable parts. Accordingly the "sale of merchandise [the rotable parts]" was not "an income-producing factor" in the operation of Apollo's computer repair business and the rotable parts pool was not inventory.

■ C. Finally, the government argues, as the Court of Federal Claims concluded, that the Commissioner's determination that Apollo's rotable spare parts pool was inventory should be upheld as a proper exercise of the Commissioner's discretion to determine when inventory accounting is required. As previously noted, I.R.C. § 471(a) states: "Whenever in the opinion of the Secretary the use of inventories is necessary in order

clearly to determine the income of any taxpayer, inventories shall be taken...." *Id.*

Despite this broad language, the Secretary's discretion to require inventory accounting is not unlimited. *See, e.g., Hallmark Cards, Inc.,* 90 T.C. at 31; *see also Transwestern Pipeline Co.,* 639 F.2d at 681 (distinguishing *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979), because in that case "it was an uncontested fact that the property in issue consisted of an inventory of goods held for sale"). Here, as we have shown, Apollo's installation of the replacement parts from its pool in repairing its customers' computers did not constitute a sale of those parts to the customers. To permit the Commissioner's discretion to determine when "the use of inventory is necessary" to trump our conclusion that the parts were not sold to customers would in effect make the Commissioner's exercise of discretion in this area virtually unreviewable, no matter how serious the legal or factual errors upon which it rested. That is not the law.

## CONCLUSION

The judgment of the Court of Federal Claims is reversed and the case is remanded to that court to enter judgment for the plaintiff.

*REVERSED AND REMANDED.*