[No. H025660. Sixth Dist. Mar. 3, 2004.]

AMDAHL CORPORATION, Plaintiff and Appellant, v.
COUNTY OF SANTA CLARA, Defendant and Respondent.

## Counsel

McDermott, Will & Emery, David L. Larson, John G. Ryan, Lisa Sattler Blackburn and Peter O. Huang for Plaintiff and Appellant.

Ann Miller Ravel, County Counsel, James J. Rees and Marcy L. Berkman, Deputy County Counsel, for Defendant and Respondent.

## OPINION

**WUNDERLICH, J.**—This appeal concerns a claim for refund of property taxes. Respondent, the County of Santa Clara (County), issued to appellant Amdahl Corporation (Amdahl) escape assessments covering a five-year span from 1993 through 1997. The property assessed involves a "pool" of spare parts used by Amdahl to service and repair its customers' computer equipment under extended service contracts. The County and Amdahl reached agreement as to the value of the spare parts pool subject to the tax, and Amdahl paid the taxes and interest thereon, which amounted to approximately $837,000 and $242,000, respectively.

Amdahl brought this action under Revenue and Taxation Code section 5140 et seq., for refund of the property taxes paid.[1] Amdahl claimed that the spare parts pool is exempt from taxation under section 219, which provides that no property taxes shall be assessed on "business inventories."

Amdahl and the County filed cross-motions for summary judgment, based upon stipulated facts. The trial court granted the County's motion, and judgment was entered in its favor. Amdahl appealed, asserting that the trial court erred, because, as a matter of law, the spare parts pool must be classified as "business inventories," exempt from the assessment of property taxes. For the reasons stated below, we disagree with Amdahl's assertion, and affirm the trial court's decision.

## STIPULATED FACTS

Amdahl manufactures, sells and leases information technology hardware products (computer equipment) for business applications. Amdahl also services and repairs the computer equipment that it sells or leases, pursuant to warranties and extended service contracts.

In connection with its service and repair functions, Amdahl maintained a pool of spare parts (the spares pool or the rotable[2] spares). Amdahl utilized the rotable spares for two purposes: (a) for replacement parts in fulfilling its maintenance and repair duties under extended service contracts with its

---

[1] All further statutory references are to the Revenue and Taxation Code unless otherwise noted.

[2] The word "rotable" is unfamiliar to this court, and we were unable to locate it in several dictionaries that we consulted. We understand, however, from counsel's briefs and oral argument that this term is used to describe replacement parts that, potentially, *rotate* between Amdahl's supply of spare parts and its customers' computer equipment.

customers;[3] and (b) to diagnose and isolate problems with particular computer equipment, through a trial and error method of replacing various parts to determine which part was nonfunctioning.

An Amdahl customer paid a flat monthly fee under the extended service agreement, which fee did not vary on the basis of whether the computer equipment being serviced was sold or leased. During the term of the extended service agreement, the customer's monthly fee was fixed, irrespective of either Amdahl's actual cost to perform under that agreement, or the number of replacement parts provided to that customer.[4] The number of replacement parts utilized, however, may have impacted the fee charged for subsequently executed service contracts with that customer or with other future customers.

The standard extended service contract required Amdahl to use new parts or refurbished ("like-new") parts as replacement parts, and provided that parts removed from the customer's computer equipment during service would become the property of Amdahl. Pursuant to the extended service contracts, Amdahl and its customers understood that Amdahl would use parts from its spares pool to satisfy Amdahl's repair and maintenance obligations.

Parts removed from the customer's computer equipment during a service call were either repaired and reconditioned (and then held for future use by Amdahl in its spares pool) or, alternatively, scrapped. The removed parts, consistent with the parties' understanding, became the property of Amdahl. Conversely, the rotable spares parts installed in the customer's computer equipment became part of the equipment owned or leased by the customer. After termination of an extended service contract, any such installed parts remained part of the equipment owned or leased by the customer.

Amdahl treated the spares pool as fixed assets (rather than as inventory) in connection with its income tax reporting and financial accounting. Amdahl capitalized the spares pool, and claimed depreciation deductions on those parts. In performing its work under extended service contracts, when Amdahl exchanged a part from the spares pool with a part from its customer's computer equipment, Amdahl continued to record depreciation expense as if there had been no exchange of parts.

---

[3] The spare parts used by Amdahl in connection with service it provided under standard warranties were *not* included in the property tax assessment, and are not at issue in this appeal.

[4] The fact that Amdahl's customers were not charged for the installation of any replacement parts from the rotable spares pool is a significant one that, for reasons unknown to this court, was omitted from Amdahl's opening brief.

The County of Santa Clara levied escape assessments[5] against Amdahl for the fiscal years, 1993–1994, 1994–1995, 1995–1996, 1996–1997 and 1997–1998. The escape assessments were based upon the County Assessor's conclusion that the spares pool maintained at Amdahl's distribution center in Santa Clara County were taxable property, and did not qualify as "business inventories" under section 219.

Thereafter, the parties reached agreement as to the full cash value of the spares pool for the relevant fiscal years (1993–1997). On April 12, 2000, the Assessment Appeals Board for the County accepted this valuation stipulation. Based upon the stipulation as to value, the County assessed property taxes and interest upon Amdahl's spares pool, under section 506,[6] as follows: fiscal year (FY) 1993 ($251,805.28 tax and $92,538.44 interest); FY 1994 ($185,851.73 tax and $64,118.85 interest); FY 1995 ($269,718.71 tax and $68,778.27 interest); FY 1996 ($60,708.80 tax and $10,016.95 interest); and FY 1997 ($51,726.10 tax and $3,897.45 interest). Amdahl paid all taxes and interest assessed against the spares pool for the fiscal years 1993–1997.

## PROCEDURAL HISTORY

Pursuant to section 5097, on September 4, 2000, Amdahl filed a verified claim for refund of property taxes and interest it paid relative to the spares pool for the fiscal years 1993–1997. The County Board of Supervisors did not act on Amdahl's claim within six months, and Amdahl, on August 23, 2001, filed timely a refund action in the Santa Clara County Superior Court, pursuant to section 5140 et seq.[7]

The Complaint filed by Amdahl alleged two causes of action, namely, a refund claim, and a claim for declaratory relief. Thereafter, on February 13, 2002, Amdahl filed a dismissal without prejudice of the second cause of action for declaratory relief.

The parties stipulated to a briefing schedule and the scheduling of a hearing on their cross-motions for summary judgment. On December 12,

---

[5] The assessor is required to levy "escape assessments" upon property that belongs on the local roll but has escaped assessment. (§ 531.) The property is assessed at its value as of the lien date for the year for which it escaped assessment. (*Ibid.*)

[6] Section 506 provides that interest at the rate of 3/4 of 1 percent per month shall be added from the date or dates the taxes would have become delinquent if they had been timely assessed.

[7] Section 5141, subdivision (b) provides that if the board of supervisors or city council fails to act on a refund claim within six months, the taxpayer may consider the claim rejected and bring an action under section 5140 et seq. A refund action must be filed in the superior court within six months of the claim's rejection. (§ 5141, subd. (a).)

2002, the court below granted the County's motion for summary judgment, and denied Amdahl's motion. The trial court concluded that Amdahl's rotable spares "are not exempt 'business inventory' [*sic*] under Revenue and Taxation Code section 129, as the spare parts are not 'goods intended from [*sic*] sale or lease in the ordinary course of business. . . .' " Judgment was entered on January 7, 2003, and Amdahl filed timely this appeal on February 25, 2003.

## DISCUSSION

### I. Standard Of Review

■ Questions of law are reviewed on appeal de novo. (*People v. Figueroa* (1999) 68 Cal.App.4th 1409, 1413 [81 Cal.Rptr.2d 216].) Matters of interpreting and applying a statute are questions of law. (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74 [89 Cal.Rptr.2d 10]; *Gapusan v. Jay* (1998) 66 Cal.App.4th 734, 740 [78 Cal.Rptr.2d 250] [de novo review for interpretation and application of statutes utilizing undisputed facts].) Thus, " '[w]e independently construe statutory law [and administrative rules and regulations (*Delta Air Lines, Inc. v. State Bd. of Equalization* (1989) 214 Cal.App.3d 518, 525 [262 Cal.Rptr. 803]. . .)], as [their] interpretation is a question of law on which we are not bound by the trial court's analysis.' [Citation.]" (*Apple Computer, Inc. v. Assessment Appeals Bd.* (2003) 105 Cal.App.4th 1355, 1365 [130 Cal.Rptr.2d 335], quoting *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1502 [82 Cal.Rptr.2d 368].)

■ Summary judgment/summary adjudication motions also involve purely questions of law, and, as such, are reviewable de novo. (*West Shield Investigations & Security Consultants v. Superior Court* (2000) 82 Cal.App.4th 935, 946 [98 Cal.Rptr.2d 612].) The appellate court, therefore, need not defer to the trial court, and is not bound by the reasons for the summary judgment ruling; the court reviews the ruling of the trial court, not its rationale. (*Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450 [75 Cal.Rptr.2d 54].)

■ In this instance, for three distinct reasons, the judgment must be reviewed by this court de novo. The issue presented concerns the meaning and effect of sections 219 and 129, as that statutory tax exemption relates to Amdahl's spares pool. Additionally, this matter comes to this court following an order granting the County's motion for summary judgment, which motion was presented to the trial court on stipulated facts. Moreover, the classification of business assets for determining taxation issues—as the trial court correctly held—is a question of law. (*Transworld Systems, Inc. v. County of Sonoma* (2000) 78 Cal.App.4th 713, 716 [93 Cal.Rptr.2d 165] (*Transworld*

*Systems*).) Therefore, this court decides de novo whether the trial court correctly held that Amdahl's rotable spares were not exempt from property tax under section 219.

## II. Tax Exemption For "Business Inventories"

■ As a general proposition, all forms of tangible personal property[8] are taxable in California. (Cal. Const., art. XIII, § 2.) By constitutional enactment and by statute, however, the California Legislature has provided that certain property is exempt from property tax. (See, e.g., Cal. Const., art. XIII, § 4, subd. (b); and Rev. & Tax Code, §§ 207, 214 [property used exclusively for religious, hospital, or charitable purposes]; Cal. Const., art. XIII, § 3, subd. (d); and Rev. & Tax Code, § 202, subd. (a)(3) [property used exclusively for public schools, community colleges, state colleges, and state universities]; Cal. Const., art. XIII, § 3, subd. (h); and Rev. & Tax Code, § 202, subd. (a)(1) [growing crops]; Cal. Const., art. XIII, § 3, subd. (i); and Rev. & Tax Code, § 211 [fruit and nut trees under four years and grape vines under three years]; Cal. Const., art. XIII, § 3, subd. (d); and Rev. & Tax Code, § 202, subd. (a)(2) [free public libraries and free museums]; Cal. Const., art. XIII, § 3, subd. (g); and Rev. & Tax Code, § 204 [burial property].) It must be recognized, however, that "[n]o property is exempt from taxation except as declared in the Constitution." (*Cane v. City and County of San Francisco* (1978) 78 Cal.App.3d 654, 657–658 [144 Cal.Rptr. 316].)

In 1968, the Legislature adopted section 219, which provided at the time for a partial tax exemption for "business inventories." (Former § 219, added by Stats. 1968, 1st Ex. Sess., ch. 1, § 4, p. 7.) Section 219 was subsequently amended seriatim, providing ultimately that "business inventories" were fully tax exempt. (Former § 219, amended by Stats. 1980, ch. 411, § 8, p. 801).) Section 219 now provides as follows: "For the 1980–81 fiscal year and fiscal years thereafter, business inventories are exempt from taxation and the assessor shall not assess business inventories." (§ 219.)

■ The term, "business inventories," is defined by statute, in part, as "includ[ing] goods intended for sale or lease in the ordinary course of business . . . ." (§ 129.) It is, therefore, essential that the property, in order to qualify for the exemption, be intended for sale or lease. (1 Ehrman & Flavin, Taxing Cal. Property (3d ed. 1997) Exempt Property, § 6:47, p. 78.) Further, "business inventories" do *not* include, inter alia, "business machinery or equipment or office furniture, machines or equipment, except when such property is held for sale or lease in the ordinary course of business." (§ 129.)

---

[8] "Personal property" embraces all property, except real estate. (§ 106.)

The tax exemption for "business inventories" under section 219 is explained further in title 18, section 133, of the California Code of Regulations (Regulation 133). The exemption is intended to "include all tangible personal property, whether raw materials, work in process or finished goods, which will become a part of or are themselves items of personalty held for sale or lease in the ordinary course of business." (Reg. 133, subd. (a)(1).) The phrase, "ordinary course of business," in the preceding sentence—which phrase is critical to an understanding of the scope of the term, "business inventories"—"does not constitute a limitation on the type of property which may be held for sale or lease, but it does require that the property be intended for sale or lease in accordance with the regular and usual practice and method of the business of the vendor or lessor." (Reg. 133, subd. (a)(1)(A).) Further, "[t]he phrase, 'goods intended for sale or lease' means property acquired, manufactured, produced, processed, raised or grown which is already the subject of a contract of sale or which is held and openly offered for sale or lease or will be so held and offered for sale or lease at the time it becomes a marketable product. Property which is ready for sale or lease must be displayed, advertised or otherwise brought to the attention of the potential purchasers or lessees by means normally employed by vendors or lessors of the product." (Reg. 133, subd. (a)(1)(B).)

Regulation 133 explains further that the exemption for "business inventories" is *not* intended to apply, inter alia, to "[p]roperty being used by its owner for any purpose not directly associated with the prospective sale or lease of that property." (Reg. 133, subd. (b)(2).) The regulations make a distinction between property held by service industries that are connected with a "profession," and property held by businesses that provide services of a "nonprofessional" nature. (Reg. 133, subd. (c).) Goods of a service professional are *not* "business inventories," even if they "may be transferred to a patient or client incidental to the rendition of the professional service." (*Ibid.*) Conversely, property held by businesses performing "nonprofessional" services "is to be regarded as 'business inventories' held for sale if such property is delivered as an item regularly included in the service." (*Ibid.*) Those who repair or recondition personal property "with the intent of transferring parts and materials shall be regarded as holding said parts and materials as 'business inventories.' " (Reg. 133, subd. (d).)

III.   Amdahl's Contentions

Amdahl contends that the trial court erred in concluding that Amdahl's rotable spares were not exempt from taxation under section 219, because they were *not* "business inventories" under section 129. Amdahl advances three essential arguments in support of its position that the rotable spares are "business inventories": (1) rotable spares meet the definition under section

129, because they are goods "intended for sale or lease in the ordinary course" of Amdahl's business of servicing and repairing its customers' computer equipment; (2) Amdahl is a "nonprofessional" service provider, which holds its rotable spares as property delivered to its customers "as an item regularly included in the service," thereby meeting the requirements of subdivision (c) of Regulation 133; and (3) Amdahl repairs and reconditions its customers' equipment "with the intent of transferring parts and materials" (i.e., the rotable spares), and, therefore, those parts and materials are "business inventories" under subdivision (d) of Regulation 133. For the reasons stated below, we reject each of these arguments, and conclude that Amdahl's rotable spares are *not* "business inventories," exempt from taxation.

## IV. Strict Construction Of Tax Exemption Laws

In our consideration of this appeal, we are mindful of certain general principles governing the claim of exemption by Amdahl. Tax exemptions are construed strictly against the taxpayer. (*Weber v. County of Santa Barbara* (1940) 15 Cal.2d 82, 87–88 [98 P.2d 492].) A private owner of property "has the burden of showing it clearly comes within the [property tax] exemption." (*Fellowship of Friends, Inc. v. County of Yuba* (1991) 235 Cal.App.3d 1190, 1197 [1 Cal.Rptr.2d 284]; see also *Sterigenics Internat. v. County of Orange* (1996) 47 Cal.App.4th 1541, 1545 [55 Cal.Rptr.2d 319] (*Sterigenics*).) An exemption from property taxation will be rejected, "unless the intention to do so is expressed in direct terms or is fairly inferable from the language of the instrument by which the right is claimed." (*Cypress Lawn C. Assn. v. San Francisco* (1931) 211 Cal. 387, 390 [295 P. 813].) Doubts concerning the applicability of the tax exemption are to be resolved against that exemption. (*Alpha Therapeutic Corp. v. County of Los Angeles* (1986) 179 Cal.App.3d 265, 270 [224 Cal.Rptr. 498].)

We must not, however, in applying these rules of strict construction and placement of burden upon the taxpayer, disregard the language of the statute. In our analysis of the statutory exemption, " 'strict construction must still be a reasonable construction.' " (*Cedars of Lebanon Hosp. v. L.A.* (1950) 35 Cal.2d 729, 735 [221 P.2d 31], quoting *State ex rel. Spillers v. Johnston* (1908) 214 Mo. 656 [113 S.W. 1083, 1084].) With these principles in mind, we address Amdahl's contentions that the trial court erred in concluding the Amdahl's rotable spares were not exempt from taxation.

## V. The Statutory And Regulatory Language Do Not Support Amdahl's Claim

Amdahl asserts that the "plain language" of Regulation 133 requires the conclusion that the rotable spares are "business inventories" that qualify for a tax exemption under section 219. We disagree.

As it pertains to the property at issue in this appeal, the goods must be "intended for sale or lease in the ordinary course of business," in order for them to constitute tax-exempt "business inventories." (§ 129). Both the prerequisites that the property (1) be "intended for sale or lease," and (2) be held "in the ordinary course of business"—considered in the context of Regulation 133—make the conclusion that rotable spares are "business inventories," at best, doubtful.

### A. Goods "intended for sale or lease"

Goods "intended for sale or lease" must be property that (1) "is already the subject of a contract of sale," (2) "is held and openly offered for sale or lease," or (3) "will be so held and offered for sale or lease at the time it becomes a marketable product." (Reg. 133, subd. (a)(1)(B).) The property is subject to the further requirement that it "be displayed, advertised or otherwise brought to the attention of the potential purchasers or lessees . . . ." (*Ibid.*) Based upon the stipulated facts presented by the parties to the court below, the rotable spares could only qualify as being "intended for sale or lease" under the second prong of Regulation 133, subdivision (a)(1)(B).

It is questionable that, once Amdahl installed a particular part from the spares pool into its customer's computer equipment, there was, in fact, a "sale or lease" of that product. In a very literal sense, the part was not *sold* or *leased* to Amdahl's customer, because the customer was not charged for the replacement part. This is underscored by the fact that the customer may have received *multiple* replacement parts from the spares pool at no charge (beyond the flat monthly maintenance fee).

In a broader sense—ignoring the absence of a charge for the replacement part(s)—it is nonetheless doubtful that a sale or lease occurred when Amdahl's customer received a replacement part from the spares pool. In the ordinary sense of a sale or lease of tangible property, there is a transfer of the property from the seller/lessor to the buyer/lessee, coupled with a corresponding reduction in the supply of the former. In the case of the installation of a replacement part from Amdahl's spares pool, however, there was a "swap" of that part for the customer's defective part, and (at least where Amdahl refurbished that part) there was no pro tanto reduction of parts in the spares pool.

Further, a "sale" of property requires that there be a transfer in exchange for some consideration. (*H.S. Crocker Co., Inc. v. McFaddin* (1957) 148 Cal.App.2d 639, 644 [307 P.2d 429].) Such consideration need not be money, but may be its equivalent or any valuable consideration. (*Id.* at pp. 644–645.) In this instance, it is apparent that *no* consideration was given

by Amdahl's customers in exchange for any replacement parts taken from the spares pool. Under the standard, extended service contract, Amdahl's customers received *any and all* replacement parts installed in their computers at no additional cost. Thus, during the life of the contract, it did not matter if the Amdahl customer received one hundred replacement parts or no parts from the spares pool; the cost was the same in either instance.

Moreover, the statements of Amdahl, itself—in other court proceedings and in its financial reporting—call into serious question the notion that its rotable spares were "held for sale or lease." In unrelated federal tax proceedings, Amdahl stated that its "pool of rotable replacement parts were used in [its] maintenance business and were not acquired and held 'for sale." While this statement is not necessarily dispositive,[9] it is certainly suggestive that the true nature of the spares pool was not business inventory held by Amdahl for sale to its customers.

Likewise, Amdahl used consistently the fixed asset method of accounting for the spares pool (and did not treat it as inventory), both for income tax and accounting purposes. Amdahl capitalized the rotable spares, and claimed depreciation deductions on those parts. It continued to record depreciation expense for a spares pool part, even after it was installed in a customer's computer and exchanged for the customer's malfunctioning part. Thus, Amdahl, itself, took the position on its financial statements that the rotable spares were not inventory.

■ A company's financial statements are representations of management as to the company's financial position. (See *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 182 [132 Cal.Rptr.2d 490, 65 P.3d 1255] ["[a] corporation's financial report invites shareholders to read and rely on it"].) "Based on generally accepted accounting principles (GAAP) the financial statements are implied or expressed representations by management. Management makes, in these financial statements, assertions regarding (1) existence and occurrence of assets, obligations, and equities, . . . (4) valuation and allocation (i.e., asset, liability, equity, revenue, and expense have been included in the financial statements at the proper amount under GAAP), and (5) presentation and disclosure (i.e., the financial statements are classified, described and disclosed properly)." (State Bd. of Equalization, Assessors' Handbook (2000) Assessment of Personal Property and Fixtures, § 504,

---

[9] By this reference to Amdahl's petition before the United States Tax Court, dated February 22, 1995, we do not mean to suggest that we concur with the County's position that Amdahl's filing with the Tax Court is conclusive evidence that the rotable spares were not "business inventories," under section 129. We believe, however, that the positions Amdahl has taken with the Tax Court and in its own financial statements are relevant (but not conclusive) evidence in this instance.

p. 159, fn. 263.)[10] We, therefore, consider Amdahl's method of accounting described above—and, in particular, its decision to classify its rotable spares as fixed assets (and not as inventory) on which it took depreciation deductions[11]—as probative evidence on the question of whether the rotable spares are "business inventories" under section 129.

Furthermore, there is scant evidence before us to suggest that Amdahl "openly offered" the rotable spares for sale or lease to its customers. The spares pool was apparently not "displayed, advertised or otherwise brought to the attention" of Amdahl's customers. (Reg. 133, subd. (a)(1)(B).)[12]

█ The critical inquiry in determining whether the property constitutes "business inventories" qualifying for an exemption under section 219 "is whether the goods are to be transferred away from the business pursuant to sale . . . ." (*Transworld Systems, supra,* 78 Cal.App.4th at p. 717.) In *Hewlett-Packard Co. v. U.S.* (Fed.Cir. 1995) 71 F.3d 398 (*Hewlett-Packard*), the court considered whether rotable spares—utilized by the taxpayer for precisely the same purpose as Amdahl herein—were "sold" upon installation into the computer of the taxpayer's customer.[13] The appellate court— determining the propriety of depreciation of property under federal tax law—noted that the rotable spares were maintained so that the taxpayer could provide better service to its customers; the court concluded that "[i]n any realistic sense [the taxpayer's] substitution of a rotable spare part for a malfunctioning original part in a customer's computer was not a sale of that part to the customer." (*Id.* at p. 400.)

█ We adopt the reasoning in *Hewlett-Packard* to this case. Amdahl's installation of a replacement part from the spares pool into its customer's

---

[10] The administrative construction of legislation by those required to enforce it—such as an assessors' handbook prepared by the State Board of Equalization—although not necessarily controlling, may be properly considered by the court. (*Carlson v. Assessment Appeals Bd. I* (1985) 167 Cal.App.3d 1004, 1012–1013 [213 Cal.Rptr. 555].)

[11] We note that, under generally accepted accounting principles (GAAP) "[i]nventory usually is classified as *(a)* finished goods, *(b)* work in process, or *(c)* raw materials [citation]. Inventories exclude long-term assets that are subject to depreciation." (Miller, GAAP Guide (2003) Inventory, p. 27.02.) In contrast, GAAP recognizes fixed assets as being property "acquired for use in operations and enter into the revenue-generating stream indirectly. They are held primarily for use, not for sale." (*Id.,* Depreciable Assets and Depreciation, at p. 12.03.)

[12] The parties presented as a stipulated fact that "Amdahl and its customers understood that Amdahl would use parts from its Spares Pool/Rotable Spares in fulfilling its maintenance and repair obligations." This, however, is not probative evidence that Amdahl "displayed, advertised or otherwise brought to the attention" of its customers, the existence of the rotable spares. In view of Amdahl's burden of proving the existence of the tax exemption, one would assume that, were there significant evidence that Amdahl "openly offered" the rotable spares to its customers, it would have presented it to the court below.

[13] *Hewlett-Packard* is discussed in greater detail in part VIII, *post.*

computer in exchange for the customer's malfunctioning part did not constitute a "sale." Therefore, Amdahl did not "hold for sale or lease" the rotable spares.

### B. Goods held "in the ordinary course of business"

In order to constitute "business inventories" under section 129 and Regulation 133, the goods must have been held by the taxpayer for sale or lease "in the ordinary course of business." (Reg. 133, subd. (a)(1).) The property must "be intended for sale or lease in accordance with the regular and usual practice and method of the business of the vendor or lessor." (Reg. 133, subd. (a)(1)(A).) For the reasons discussed above, Amdahl did not intend to hold the rotable spares "for sale or lease," and the practical effect of exchanging a part from the spares pool for a malfunctioning one from the customer's computer was not a "sale."

Amdahl's "usual practice and method of [its] business" did not involve the intended sale or lease of the property "in the ordinary course of business." One of Amdahl's purposes for maintaining this pool was to have parts available to "troubleshoot" problems experienced by its customers. Clearly, utilizing the spares pool for this purpose was not holding the parts "for sale of lease in the ordinary course of business." Further, Amdahl admitted previously in a court petition filed in unrelated proceedings that the rotable spares "were not acquired and held for sale." The rotable spares were established by Amdahl for its maintenance business, in order to provide better service to its customers, and were not held for sale in the ordinary course of Amdahl's business.

Amdahl's tax and accounting treatment of the spares pool was part of the company's "usual practice and method of business." This practice suggests that the property was *not* held for sale or lease. The taxpayer's failure (1) to treat the exchange of the rotable spares to the customers as sales, and/or (2) to collect any sales tax from such transfers, are factors pointing to the conclusion that the goods were not "business inventories" that were "held for sale or lease in the ordinary course of business." (*Westinghouse Beverage Group, Inc. v. County of San Diego* (1988) 203 Cal.App.3d 1442, 1444 [250 Cal.Rptr. 784] (*Westinghouse Beverage*) [soft drink manufacturer's reusable containers supplying carbon dioxide gas and syrup, supplied to wholesale customers—where manufacturer did not account for exchanges of containers as sales and did not collect sale tax for the transactions—held not "business inventories"].) Furthermore, Amdahl's practice of holding and using the rotable spares is identical to the practice of the taxpayer/computer repair company in *Hewlett-Packard, supra,* 71 F.3d 398; in that case, the Federal Circuit concluded that the taxpayer did *not* hold the spares for sale.

A critical component of "business inventories" is that the goods being held for sale or lease are so held "in the ordinary course of business." We conclude that Amdahl's rotable spares fail to meet this criterion under Regulation 133.

### C. *Goods supplied by a nonprofessional service provider (Regulation 133(c))*

Amdahl claims that it is a "nonprofessional" service provider, which held its rotable spares as property delivered to its customers "as an item regularly included in the service." Amdahl urges that the rotable spares, thus, constituted "business inventories," because they met the requirements of subdivision (c) of Regulation 133. We disagree for three principal reasons.

*First*, Amdahl has not established that it was a "nonprofessional" service provider within the ambit of Regulation 133, subdivision (c). The regulation identifies certain nonexclusive examples of "professional" and "nonprofessional" service providers. Endeavors "such as medicine, law, architecture or accountancy," are considered professions that are primarily service activities, in which the goods, even though they are transferred to the patient or client, are deemed *not* "business inventories." (Reg. 133, subd. (c).) Businesses "such as dry cleaners, beauty shop operators and swimming pool service companies" are of a "nonprofessional type," and the goods delivered to the customer incidental to the service *are* considered "business inventories." (*Ibid.*)

Amdahl does not fall neatly into either category. As it pertains to this appeal, Amdahl serviced and repaired the information technology equipment that it sold or leased to its customers under extended service contracts. Unlike law, medicine, or accountancy, the services Amdahl provided did not require that its employees obtain advanced degrees. On the other hand, servicing and repairing computers involves a significant degree of technical training and know-how, which is in stark contrast to the "nonprofessional" service provided by dry cleaners, beauty shop operators, and swimming pool service companies.

The services of a "professional" are those " 'arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual. [Citations.]' [Citation.]" (*Hollingsworth v. Commercial Union Ins. Co.* (1989) 208 Cal.App.3d 800, 806 [256 Cal.Rptr. 357], quoting *Marx v. Hartford Accident and Indemnity Company* (1968) 183 Neb. 12 [157 N.W.2d 870, 872].) A profession is "[a]

vocation requiring advanced education and training." (Black's Law Dict. (7th ed. 1999) p. 1226.)[14]

■ The repair and maintenance of sophisticated computer equipment requires a significant amount of specialized knowledge, training, and skill. Clearly, it is of a quality far different from the "nonprofessional" services performed by dry cleaners, beauty shop operators, and swimming pool service companies. We conclude, therefore, that the work performed by Amdahl in servicing and repairing its customers' computer equipment was a "profession" within the meaning of Regulation 133, subdivision (c).

*Second,* there is a somewhat subtle but distinct difference between the property that "nonprofessionals" (identified in Reg. 133, subd. (c)) supply to their customers, and the property that Amdahl provided to its customers. For example, the customer of the swimming pool service *actually receives* something (*e.g.,* chlorine) that he or she did not have before the service; at the same time, the service provider's supplies are diminished. Where an Amdahl customer received a replacement part from the spares pool, however, it exchanged that part to Amdahl for the nonfunctional part; the customer did not receive something that he or she did not already have, and Amdahl's spares pool was not reduced. Thus, even if Amdahl's services were to be considered "nonprofessional," the rotable spares that it provided in conjunction with its service do not fall squarely within Regulation 133, subdivision (c).

*Third,* Amdahl's argument requires a reading of subdivision (c) of Regulation 133 out of context. Regulation 133 must be read as a whole. In particular, subdivision (a) of the regulation—which serves to amplify the definition of "business inventories" found in section 129—is a base line requirement. Thus, one cannot conclude—simply by application of subdivision (c) of Regulation 133—that goods "regularly included" to a customer in service provided by a nonprofessional constitute "business inventories." That property must also satisfy the requirements in subdivision (a)—and in section 129—that it be goods "held for sale in the regular course of business." For the reasons discussed above, Amdahl's spares pool were not goods "held for sale in the regular course" of Amdahl's business.

---

[14] Similarly, James Ballentine defines "profession" as "[a] vocation or employment in preparation for which specialized education and training is required, as in law, medicine, or engineering. [Citation.] A vocation characterized by the use of specialized knowledge or attainments. [Citation.]" (Ballentine's Law Dict. (3d ed. 1969) p. 1004.)

### D. *Parts and materials furnished by a repairer or reconditioner under Regulation 133, subdivision (d)*

Amdahl claims that it repairs and reconditions its customers' equipment "with the intent of transferring parts and materials" (i.e., the rotable spares), and, therefore, those parts and materials are "business inventories," under subdivision (d) of Regulation 133. We disagree.

Superficially, this provision would *appear* to have some application to the instant case. Amdahl's role in servicing and repairing its customers' equipment, however, was not the typical situation of a repairer or reconditioner. For example, in the case of an auto mechanic, an inventory of spare parts is kept for installation in customers' vehicles; the mechanic charges for those parts installed, and the installation of those parts results in a reduction in the mechanic's inventory. In contrast, Amdahl did not charge its customers for the replacement parts utilized from the rotable spares, even if *multiple* parts were used.[15] Furthermore, since the replacement parts from the spares pool were "swapped" with the customers' nonfunctional parts (which were refurbished and placed into Amdahl's rotable spares supply), there was no reduction in Amdahl's spares pool.

Moreover, the rotable spares must be "held for sale or lease in the ordinary course of business." (Reg. 133, subd. (a)(1).) For the reasons discussed above, we conclude that the subject property was not so held.

### E. *Property used for purposes other than its sale or lease under Regulation 133, subdivision (b)(2)*

Certain property, by definition, is not classified under the category, "business inventories." Under subdivision (b) of Regulation 133, captioned, "Exclusions," the following property, inter alia, is deemed *not* to be eligible for the "business inventories" tax exemption: "Property being used by its owner for any purpose not directly associated with the prospective sale or lease of that property." (Reg. 133, subd. (b)(2).)

We have determined that Amdahl's rotable spares were not "held for sale or lease in the ordinary course of business." This conclusion is founded, in part, upon the fact that Amdahl held its spares pool in order to provide better service to its customers in connection with Amdahl carrying out its

---

[15] Indeed, as was the case in *Honeywell, Inc. v. Commissioner* (1992) T.C. Memo 1992-453, 1992 TaxCt.MemoLEXIS 478, 64 T.C.M. (CCH) 437, 447—a case that also involved a computer manufacturer that serviced its customers' computers through a rotable spare parts pool—it is unclear whether Amdahl's customers, in the ordinary case, *were even aware* of the fact that specific replacement parts from the spares pool were installed in their equipment.

maintenance and repair obligations under its extended service contracts. It follows logically, therefore, that Amdahl used the rotable spares for a "purpose not directly associated with the prospective sale or lease of that property." (Reg. 133, subd. (b)(2).) The rotable spares, thus, are excluded under Regulation 133, subdivision (b)(2) from the definition of "business inventories."

Amdahl, the taxpayer, bears the burden of showing that the property at issue (i.e., the spares pool) " 'clearly comes within the terms authorizing exemption [citations], and any doubt must be resolved against the right to an exemption [citations].' [Citation.]" (*Sterigenics, supra,* 47 Cal.App.4th at p. 1545, quoting *Associated Beverage Co. v. Board of Equalization* (1990) 224 Cal.App.3d 192, 211 [273 Cal.Rptr. 639].) We have concluded that Amdahl has failed to meet its burden, and that a strict, but reasonable, construction of sections 219 and 129 does not support the taxpayer's claim of exemption.

VI.  *The Legislative Intent Of Section 219 Does Not Compel The Conclusion That Amdahl's Rotable Spares Are Exempt From Taxation*

Amdahl contends that the classification of its rotable spares as "business inventories" is consistent with the legislative history of section 219, and that the intent was for the tax exemption to be read broadly.[16] Our review of the legislative history does not lead us to these conclusions.

The business inventories exemption dates back to 1968, at which time California enacted a 15 percent property tax exemption for business inventories, beginning in the 1969–1970 year. (Former § 219.) The enactment of former section 219 and the promulgation of its successor statutes—providing a partial, and (ultimately) a complete tax exemption—were founded upon criticism of the inequities and negative economic consequences associated with the taxation of business inventories. (See Bagley & Azevedo, *Tax Reform—1970* (1971) 2 Pacific L.J. 56, 81–84.)

The perceived inequities and negative economic factors relating to the taxation of inventory were described in a 1968 Senate staff study. (See Sen.

---

[16] Amdahl's argument concerning legislative history includes a reference to an Assembly report entitled Facts About Assembly Bill 66 (Lockyer) Chapter 1150–Statutes of 1979. Amdahl asserts (incorrectly) that this Assembly report "sets forth reasons for the business inventory exemption." The passage from the Assembly report quoted by Amdahl actually reads as follows: "*Business leaders have contended that* the business inventory tax is an onerous burden which . . . has encouraged California firms to expand their warehousing in other nearby states, has created economic disruptions among firms attempting to minimize inventories on March 1 lien date . . . ." (*Id.* at p. 6, italics added to indicate words not quoted by Amdahl.) Amdahl is clearly incorrect, to the extent that it identifies these objections to taxation of business inventory as being those of the Assembly report's author.

Com. on Rev. & Tax. (Mar. 1968) Staff Rep., An Analysis and Evaluation of Proposals Relating to the Ad Valorem Taxation of Business Inventories in Cal. (March 1968 Staff Report).) Significantly, the inequities and negative economic factors identified in the March 1968 Staff Report do not suggest that property of the type at issue herein (i.e., Amdahl's rotable spares) be exempt from taxation.

The March 1968 Staff Report delineated the following alleged inequities with respect to the taxation of inventory: (1) the effective tax rate may be slightly higher on inventories than the tax rate for other property, because of the annual appraisal of inventories (vis-à-vis the less frequent appraisal of real property); (2) goods-producing or selling operations are taxed on inventories that they are required to maintain, while businessmen involved in service operations generally do not pay such taxes; (3) there is a degree of arbitrariness in the assessment of property tax as between different businesses, in that certain businesses require high levels of inventory on the March 1 lien date, while others have lower inventory levels on the same date; (4) taxes on inventory are paid, irrespective of the profitability of the business (and some businesses may have higher inventories and higher taxes during unprofitable periods); and (5) the inventory tax is loosely related to gross sales, which may result in unequal treatment of different businesses with the same gross sales (e.g., one business with a more frequent "turn" of inventory may pay significantly less taxes than a business with the same annual gross sales, but with a slower inventory "turn"). (Mar. 1968 Staff Rep., *supra,* at pp. 10–11.) These perceived inequities do not apply to the taxation of Amdahl's rotable spares. Further, the factors identified in the March 1968 Staff Report are associated primarily with "inventory businesses," such as manufacturing, wholesaling, and retail concerns; they are not reflective of businesses such as the service and repair of computers at issue in this appeal.

The March 1968 Staff Report also identified several economic arguments made by proponents of a tax exemption for inventories, including: (1) taxation of inventories discourages manufacturers and some wholesalers from locating or expanding in California; (2) California producers and manufacturers whose inventories are taxed cannot compete with their counterparts located in states that do not tax inventories; (3) taxation of inventories results in increased storage of goods outside of California and discourages construction of warehouse space in this state; (4) manufacturers, wholesalers, and retailers deplete their inventory prior to the lien date to reduce their tax liability, resulting in economic losses; (5) a tax exemption for inventory will decrease the price of goods; and (6) exempting inventories from taxation will encourage manufacturers to locate new facilities in this state. (Mar. 1968 Staff Rep., *supra,* at p. 12.) Again, these factors identified as potential reasons for enacting a property tax exemption for inventories do not obtain to the type of property or the kind of business we consider in this appeal.

For the reasons discussed in part V, *ante*, based upon a fair reading of section 129 and Regulation 133, we conclude that rotable spares are not "business inventories." Furthermore, the legislative history does not suggest that the tax exemption provided for business inventories under section 219 should be expanded to include the rotable spares. Simply stated, the reasons for the tax exemption do not demonstrate that "business inventories" should be broadened to include the rotable spares property at issue in this appeal.

## VII. *Case Authority Under Section 219 Does Not Support Amdahl's Claim*

There are only four reported decisions that have considered whether particular items of personal property were "business inventories," exempt from taxation under sections 219 and 129. None of those cases involved the specific type of rotable spares property that Amdahl claims herein to be exempt. Likewise, none of the analyses in any of the cases compels us to conclude that the rotable spares property constitute "business inventories."

Amdahl contends that the holding in *May Department Stores Co. v. County of Los Angeles* (1987) 196 Cal.App.3d 755 [242 Cal.Rptr. 162], is consistent with the view that Amdahl's rotable spares are exempt, "business inventories." *May Department Stores,* involved, inter alia, the question of whether the price tags and sales receipts delivered to a retailer's customers were "business inventories," entitled to exemption under section 219. The appellate court concluded that the price tags and sales receipts were "delivered to the customer with the merchandise purchased," and, thus, were properly classified as "business inventories" rather than as supplies. (*May Department Stores,* at p. 764.)

*May Department Stores* is entirely distinguishable. In contrast to the facts herein, the taxpayer in *May Department Stores* was a retailer *selling goods* to its customers. The property at issue was transferred to the customers as part of the sale of goods. In this instance, Amdahl "sold" services to its customers for a flat fee. Moreover, in *May Department Stores*, the transfer of the price tags and sales receipts to a customer resulted in (a) the customer receiving something that he or she did not have previously, and (b) the reduction in the retailer's supply of the product transferred. Neither result occurred in the case of Amdahl supplying replacement parts from its spares pool to its customers.

Amdahl also urges that its position is consistent with the holding in *Westinghouse Beverage, supra,* 203 Cal.App.3d 1442. In that case, the court addressed, inter alia, whether the reusable containers containing carbon dioxide and syrup that were provided by a beverage manufacturer to wholesalers were "business inventories." The appellate court concluded that the

containers were *not* exempt property, because they were retrievable by the manufacturer, and they were "not intended for sale within the meaning of the statute." (*Id.* at p. 1445.)

The holding in *Westinghouse Beverage* does not support Amdahl's position. The facts are entirely distinguishable from this case.[17] The taxpayer in *Westinghouse Beverage* was a seller of products, not a service provider. Amdahl claims that, the fact that the beverage manufacturer in *Westinghouse Beverage* did not relinquish control of the reusable containers, is supportive of its position herein. We disagree. The absence of relinquishment of control in *Westinghouse Beverage*—juxtaposed against Amdahl's transfer of the replacement parts from the spares pool to its customer in exchange for the customer's malfunctioning part—does not compel the conclusion that the rotable spares, by contrast, were "held for sale."

Likewise, the case of *Sterigenics*, *supra*, 47 Cal.App.4th 1541, does not compel a different result. In *Sterigenics*, the taxpayer claimed that its cobalt 60, which it used to irradiate its customers' products, were "business inventories." The court of appeal affirmed the trial court's rejection of this exemption claim. (*Id.* at p. 1543.) In so holding, the appellate court rejected the taxpayer's three arguments, concluding that the taxpayer (a) did not hold the cobalt 60 for sale or lease, (b) did not intend to incorporate the cobalt 60 into an item for sale or lease, and (c) did not "deliver" the cobalt 60 as part of its "nonprofessional" service. (*Id.* at pp. 1544–1545.)

The facts presented in *Sterigenics* are distinguishable. The court of appeal's acknowledgment that goods supplied by a nonprofessional service provider incidental to the service may be considered "business inventories," does not suggest that Amdahl's rotable spares should be so classified. For the reasons we have discussed above, the subject goods were not "business inventories," under subdivision (c) of Regulation 133 or under any other section of that regulation.

Lastly, Amdahl contends that a reading of *Transworld Systems*, *supra*, 78 Cal.App.4th 713, suggests that Amdahl's rotable spares were exempt, because they were goods furnished incidental to Amdahl's rendition of nonprofessional service. *Transworld Systems* concerned whether the preprinted form letters of the taxpayer (a collection service), which were provided as part of its service of sending collection letters to debtors of its customers, were "business inventories." The court of appeal concluded that the preprinted

---

[17] Indeed, as discussed in part V.B, *ante*, the facts that are common to *Westinghouse Beverage* and to this appeal—i.e., that neither taxpayer treated the transfer of the product at issue as a sale for accounting purposes and neither collected sales taxes—suggest a common conclusion that the property at issue are *not* "business inventories."

form letters were exempt, because they were business inventories "delivered incidental to the rendition of the [nonprofessional] service," within the meaning of subdivision (c) of Regulation 133. (*Id.* at p. 718.)

Again, the facts presented in *Transworld Systems* are distinguishable. Because we have concluded that Amdahl's rotable spares were not "held for sale or lease in the ordinary course of business," and were not property provided by a nonprofessional service provider "as an item regularly included in the service," *Transworld Systems* is simply not precedent in support of Amdahl's position.

VIII. *The Hewlett-Packard Case*

The County cites *Hewlett-Packard, supra,* 71 F.3d 398, as being strongly supportive of its position that Amdahl's rotable spares are not exempt under section 219. Conversely, Amdahl argues that *Hewlett-Packard* has no application whatsoever, since the case concerned the entirely different issue of whether a computer repair company, under federal tax law, was entitled to depreciation deductions and investment tax credits with respect to its rotable spare parts pool. In support of its contention that this court should not consider *Hewlett-Packard,* Amdahl cites *Hoffman v. Connell* (1999) 73 Cal.App.4th 1194 [87 Cal.Rptr.2d 272]. In *Hoffman,* the court held that state tax may be collected only where authorized under California law, and it would not rely upon federal tax principles to impose state taxes where not provided under state law. (*Id.* at p. 1203.) This principle enunciated in *Hoffman* does not compel us to disregard *Hewlett-Packard* as precedent.

We believe that, while not dispositive, *Hewlett-Packard* is quite instructive in this instance. Although that case concerned federal income tax law, and, admittedly, did not address the "business inventories" exemption under California law, its facts are virtually identical to the case at hand.

In *Hewlett-Packard,* the computer repair company, Apollo Computer, Inc. (Apollo)—Hewlett-Packard's predecessor—segregated rotable spares from its regular manufacturing inventory, and used that pool only for its computer repair business. (*Hewlett-Packard, supra,* 71 F.3d at p. 399.) Apollo's technicians used the parts from the rotable spares pool both for diagnostic purposes, and to replace parts that were malfunctioning in the customers' computers. (*Ibid.*) Apollo generally repaired the malfunctioning parts from the customers' computers, and returned them to the rotable spares pool. (*Ibid.*) Apollo utilized this rotable spares procedure to avoid downtime for its customers' computers. (*Ibid.*) Apollo treated the rotable spares as a capital asset (rather than as inventory), on which it took depreciation deductions and investment tax credits. (*Ibid.*)

The Internal Revenue Service, on audit, disallowed Apollo's depreciation deductions and investment tax credits on the basis that Apollo was required to treat the rotable spares pool as inventory. (*Hewlett-Packard, supra,* 71 F.3d at p. 399.) The Court of Federal Claims rejected Apollo's tax refund claim, holding that the IRS had properly determined that the rotable spares pool was inventory. (*Ibid.*) The lower court's conclusion was based upon the reasoning that the rotable spares " 'primarily were held for sale to customers in the ordinary course of the maintenance/repair segment of its business.' [Citation.]" (*Id.* at p. 400, *quoting Apollo Computer, Inc. v. United States* (Fed.Cl. 1994) 32 Fed.Cl. 334, 356.)

The appellate court acknowledged that the government had properly identified the central issue in the case: " '[T]he controlling question here is whether taxpayer's placement of a rotable part in a customer's computer in the course of providing maintenance or repair service constitutes a sale of that part.' " (*Hewlett-Packard, supra,* 71 F.3d at p. 400.) Although the context of the inquiry in *Hewlett-Packard* differed, that case and the present one share a common core issue, i.e., the ultimate determination of the nature of the transaction under which a part from the rotable spares pool is placed in the customer's computer.

The appellate court in *Hewlett-Packard,* noted that, "[u]nlike the typical seller, Apollo does not furnish the rotable spare parts to the customer in exchange for or to receive the purchase price. Instead, it does so to enable it to provide better service, *i.e.,* to avoid additional computer downtime that the customer would suffer. . . ." (*Hewlett-Packard, supra,* 71 F.3d at p. 400.) The court also noted that Apollo's customers did not pay for any replacement parts from the rotable spares pool (*ibid.*), and that the price Apollo charged under its service contracts was not based upon an estimate of the cost of replacement parts it would use in servicing a particular computer. (*Id.* at p. 401.)

Further, the *Hewlett-Packard* court noted the significant difference between the depletion in supplies in the normal inventory situation versus the lack of reduction of the rotable spares pool: "In a typical inventory situation, the sale of an item out of inventory reduces *pro tanto* the size of the inventory, which normally is replenished only after its size has been significantly diminished. In contrast, in the present case the withdrawal of a part from Apollo's rotable parts pool did not reduce the size of the pool, because that part was replaced with the repaired malfunctioning original part removed from the customer's computer." (*Hewlett-Packard, supra,* 71 F.3d at p. 401.) The court contrasted the standard inventory scenario with the rotable spares approach, indicating that "both Apollo and its customers had the same item before and after the replacement, the only difference being the substitution of a functioning part for a non-functioning one in the customer's computer." (*Ibid.*)

Based upon the nature of the exchange of replacement parts from the rotable spares pool with malfunctioning parts from the computers of Apollo's customers, the court concluded that this transaction "was not a sale of those rotable parts." (*Hewlett-Packard, supra,* 71 F.3d at p. 402.) ■ For all of the reasons discussed above, we concur with the appellate court's reasoning in *Hewlett-Packard,* and agree with its conclusion that the installation of a replacement part from a rotable spares pool into a customer's computer does not constitute a "sale" of that part.

## DISPOSITION

The judgment entered on the order granting the County of Santa Clara's motion for summary judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.